OPINION
{¶ 1} On July 17, 2001, the Franklin County Grand Jury indicted defendant-appellant, Radwan Nasser, with four separate counts of endangering children, one count of felonious assault, and one count of felony murder. The offenses arose from the death of his three-year-old stepdaughter, Layla, and injuries suffered by his five-year-old stepson, Jamamil, in July 2001. The case was tried to the court without a jury. At the conclusion of the state's case, defense counsel moved, under Crim.R. 29, for a motion of acquittal as to count five of the indictment alleging that defendant did recklessly abuse Jamamil, resulting in serious physical harm to a child under the age of 18 years. The trial court granted the motion based upon a finding that there was no evidence of serious physical harm to Jamamil. (Tr. 1075.) At the conclusion of the trial, the trial judge found defendant guilty of the remaining charges and sentenced defendant to the mandatory term of imprisonment of 15 years to life on the felony murder conviction. Defendant was sentenced to four years as to count one, four years as to count two, two years as to count four, and six months as to count six. The trial court ordered that the sentences be served concurrent with each other.
{¶ 2} Defendant filed a timely notice of appeal and assigned the following seven assignments of error:
 Assignment of Error No. 1:
The court of common pleas committed plain error and deprived Defendant-Appellant of his rights to due process and a fair trial under U.S. Const. amend. V and XIV and Ohio Const. art. 1 § 16 and to confront the witnesses against him and the assistance of counsel under U.S. Const. amend. VI and XIV and Ohio Const. art. 1, § 10, and his statutory rights to an appointment of an interpreter under state statute when it failed to conduct an inquiry and make a ruling regarding his need for a language interpreter after the court had been placed on notice that Defendant-Appellant's native tongue is Somalian, that he had difficulty understanding English, and that he likely would be unable to comprehend the expected evidence, especially the complex forensic and medical testimony.
 Assignment of Error No. 2:
The court of common pleas committed reversible error and deprived Defendant-Appellant of his right to a jury trial under U.S. Const. amend. VI and XIV and Ohio Const. Art. 1, § 5 when it failed to conduct an in-depth colloquy with Defendant-Appellant, aided by an interpreter, regarding the contents of the statutory jury wavier form, after the court had been placed on notice that he had substantial difficulties with the English language and lacked familiarity with the American judicial system.
 Assignment of Error No. 3:
The court of common pleas abused its discretion and deprived Defendant-Appellant of his right to due process and a fair trial under U.S. Const. amend. V and XIV and Ohio Const. art. 1, § 10, his right of confrontation under U.S. Const. amend. VI and XIV and Ohio Const. art. 1, § 16, and his rights under the Ohio Rules of Evidence when it (1) failed to conduct an adequate inquiry into the competency of the five year old victim-witness, (2) restricted defense counsel's examination of the competency of the witness, and (3) allowed the witness to testify despite indications that he appeared incapable of receiving just impressions of the facts and circumstances and of relating them truthfully.
 Assignment of Error No. 4:
The court of common pleas committed reversible error and plain error and deprived Defendant-Appellant of his right to due process and a fair trial under U.S. Const. amend. V and XIV and Ohio Const. art. 1, § 16
and his right of confrontation under U.S. const. amend. VI and XIV and Ohio Const. art. 1, § 10 when it admitted pursuant to the Evid.R. 803(4) exception to the hearsay rule the out of court statements of a five year older child implicating Defendant-Appellant in the violent death of the child's sister where such statements were not made for purposes of medical diagnosis or treatment of the child declarant or his sister.
 Assignment of Error No. 5:
The court of common pleas committed plain error and deprived Defendant-Appellant of his right to due process and a fair trial under U.S. Const. amend. V and XIV and Ohio Const. art. 1, § 16 when it permitted the hospital physicians to offer improper opinion testimony that the deceased child's injuries were intentionally inflicted.
 Assignment of Error No. 6:
Defendant-Appellant's convictions are not supported by evidence sufficient to satisfy the requirements of due process under U.S. Const. amend. V and XIV and Ohio Const. art. 1, § 10; or, alternatively, are against the manifest weight of the evidence.
 Assignment of Error No. 7:
Defendant-Appellant was denied his right to the effective assistance of counsel guaranteed to him under U.S. Const. amend. VI and XIV and Ohio Const. art. 1, § 10.
{¶ 3} On July 8, 2001, Layla Dirir was pronounced dead at Children's Hospital in Columbus, Ohio, as a result of injuries she sustained on July 7, 2001. Patrick M. Fardal, M.D., the Franklin County Coroner, certified the immediate cause of her death as being from multiple blunt impacts to the head and identified seven separate areas of bruising on Layla's head. Specifically, Dr. Fardal identified the following relevant injuries:
1. A 2 x 1 inch hemorrhage into the right occipital scalp.
2. There is a 1-1/2 x 1 inch contusion in the left parietal area.
3. There is a 1/2 inch contusion in the left parietal cortex adjacent to #2.
4. There is a 1-1/2 inch contusion in the posterior occipital area near the midline.
5. There is a 1 inch midline contusion in the frontal area.
6. There is a 1-1/2 x 1 inch contusion of the left posterior parietal occipital area.
7. There is a 1-1/2 inch contusion of the right parietal area.
8. There is a 3 inch fracture of the occipital bone that extends from the right to cross the midline to the left. This ends at the foramen magnum.
9. There is a mild subdural hematoma over the left convexity with no more than 5 cc of blood.
10. The brain weighs 1510 gm. Mild subarachnoid hemorrhage is seen over the convexities (more on the left than on the right). There is diffuse cerebral edema present.
{¶ 4} Dr. Mary Lou McGregor, a pediatric ophthalmologist, examined Layla's eyes and noted "scattered retinal hemorrhages or spots of blood throughout the retina very concentrated around the optic nerve or nerve that connects the eye to the brain." (Tr. 755.) Dr. McGregor testified that, in almost all circumstances, retinal hemorrhages are indicative of shaken baby syndrome and are considered a result of non-accidental trauma until proven otherwise. (Tr. 756.) Dr. McGregor testified further that retinal hemorrhages occur where there is acceleration/deceleration of the head. The classic example is when a child is being physically shaken so that their neck bounces back and forth. The acceleration/deceleration-type injury causes breaks in blood vessels inside the eye. Id. Dr. McGregor testified that retinal hemorrhages could be caused from a single head trauma; however, the trauma would have to be severe such as when a child is thrown from a car and hits a tree. (Tr. 771.) Dr. Fardal agreed with the conclusion of Dr. McGregor that the retinal hemorrhages were most likely caused from shaken baby syndrome. (Tr. 558-560.) Dr. Fardal testified that a fall in the bathtub would account for one set of injuries but would not account for the other head injuries suffered by Layla. (Tr. 550-553.) Dr. Fardal concluded that, based upon all of the injuries suffered by Layla, the injuries were "non-accidental." (Tr. 589-590.)
{¶ 5} Two other physicians testified regarding Layla's condition. Dr. Marjorie Arca, a pediatric surgeon at Children's Hospital, supervised Layla's resuscitation. She noted that, when Layla was brought into the hospital, she was unresponsive to voice or pain. Layla had no spontaneous respirations. Layla's Glasgow rating was a three, which is the lowest rating and indicates no spontaneous movements and no response. Layla's pupils were fixed and dilated, which is significant of brain injury. (Tr. 356-363.) Dr. Arca also noted that retinal hemorrhages most commonly occur when a child suffers a severe acceleration/deceleration injury, such as when they are shaken. (Tr. 375-376.) Dr. Arca spoke with defendant to get more information. Defendant told her that Layla and Jamamil were in the bathtub and that he went into the living room to smoke a cigarette. Jamamil came out of the bathroom five to six minutes later indicating that Layla was in trouble. Defendant entered the bathroom, saw Layla laying in the bathtub, picked her up, noted she was nonresponsive and called 911. Defendant tried administering CPR. (Tr. 365-366.) Dr. Arca testified that Layla's injuries were not consistent with defendant's story. She noted that a fall in the bathtub could generate a skull fracture, but the swelling of Layla's brain was not consistent with a single-blunt impact. Further, retinal hemorrhages are not consistent with a single-blunt impact. (Tr. 379-381.) Dr. Arca also noted that Layla was dry, including her hair, when she presented at the hospital. (Tr. 386.) Dr. Arca agreed with Dr. Fardal's conclusion and noted that his ultimate findings solidified her opinion that Layla's injuries had been inflicted intentionally as opposed to accidentally. (Tr. 399; 407.) Furthermore, Dr. Arca testified that she is mandated by law to report suspected child abuse cases. (Tr. 393.)
{¶ 6} Dr. Charles Johnson, the pediatrician who directs child abuse trauma at Children's Hospital, also testified after he reviewed Layla's medical records. (Tr. 600.) Dr. Johnson concluded that Layla's injuries were intentionally inflicted due to the fact that there were multiple impacts and that the retinal hemorrhages were indicative of an acceleration/deceleration shaking. (Tr. 606.) Dr. Johnson noted that retinal hemorrhages can occur after a car accident but not when a child falls down stairs or onto the floor. (Tr. 609.) Dr. Johnson noted that retinal hemorrhages could occur when a child is thrown up against a wall or a bed. Id. Dr. Johnson also testified that, if Layla had a single impact on her head as a result of falling in the bathtub, it would be highly unlikely that she would have been unconscious. Furthermore, he concluded one would not expect trauma in multiple areas from a single fall because people do not bounce when they fall. (Tr. 612-613.) On cross-examination, Dr. Johnson noted that, although it was highly unlikely that Layla fractured her skull when she struck her head, it was possible; however, death was a very unlikely result. (Tr. 641-642.) On redirect, Dr. Johnson was asked whether it would have been possible for Layla's brother, Jamamil, to have caused her acceleration/deceleration injuries. Dr. Johnson testified that it would be highly unlikely for a five-year-old child to inflict those injuries on an infant, let alone on a three-year-old child. On recross-examination, Dr. Johnson testified that it was possible to have an acceleration/deceleration injury caused by a single throw into a wall or a bathtub, but that even that would be highly unlikely. (Tr. 670.)
{¶ 7} At approximately 4:50 p.m. on July 7, 2001, defendant called 911 and told the dispatcher that his daughter was going to die. When asked questions, defendant indicated that he had Layla in the bedroom and that she was breathing a little. (Tr. 969.) Shortly thereafter, defendant indicated that Layla had stopped breathing, and the dispatcher instructed him in CPR. At the end of the telephone call, the dispatcher told defendant that, if Layla had any clothes on her chest, defendant should take them off or open them up. (Tr. 976.)
{¶ 8} At 4:50 p.m., medical personnel were dispatched to defendant's apartment. Paramedics, Weber, Massey and McGee, arrived at the scene at 4:55 p.m. (Tr. 175; state's Exhibit C.) Weber testified that the dispatcher indicated that CPR was in progress. (Tr. 129.) When they arrived at the apartment, the door was locked. When defendant opened the door, the medics asked him twice what was going on. Defendant pointed down the hall. (Tr. 133-134.) The medics found Layla in the bedroom lying on the floor between two double beds. Layla's feet were partially under one of the beds. Massey noticed that she did not have a pulse and was not breathing. Massey picked Layla up and took her to the living room. (Tr. 134-135.) Massey testified that Layla's pupils were fixed and dilated, which is indicative of a closed head injury. (Tr. 209.) Officers Weber and Massey indicated that Layla's hair and body were dry and that she was wearing pants but not a shirt. (Tr. 150; 195-200.) Both medics spoke with defendant. According to Massey, defendant indicated that he thought Layla might have had a seizure and had fallen in the bathtub. (Tr. 149.) Defendant pointed to the right side and back of the tub but indicated that he was not in the room when it happened. Massey felt the tub with his gloved hand and noted that it was dry with the exception of a little moisture by the drain. (Tr. 211-213.) Massey attempted to speak with Jamamil; however, he indicated that defendant spoke to Jamamil in a foreign language, and defendant answered that Layla had hit her head on the tub. (Tr. 216.) At 5:20 p.m., the medics transported Layla to the hospital, where they arrived at 5:32 p.m. (State's Exhibit C.) Massey testified that, in his opinion, defendant's explanation just did not seem right and that the medics decided that the Columbus Police Department should be involved. (Tr. 220.) On cross-examination, Massey testified that it would have been very difficult for anyone to perform CPR on Layla where she was laying between the beds.
{¶ 9} Columbus Police Officer Keith Conner testified that he and Officer Timothy O'Donnell were dispatched to the apartment on July 7, 2001, for the purpose of securing the scene. (Tr. 257-262.) While they were there, two women approached them with a young boy, Jamamil. The women had been asked to watch Jamamil while Layla was transported to the hospital, and they now asked the police officers to keep him. (Tr. 263-264.) The officers began talking with Jamamil trying to assure him that everything was going to be alright. Officer O'Donnell placed his hand on Jamamil's head, and Jamamil pulled away and said, "Don't touch me on my head." (Tr. 265.) Officer Conner knelt down and examined Jamamil's head with a flashlight. Officer Conner noted a red bump on his head. When asked what happened, Jamamil answered, "That's where my daddy hits me," or "That's why it's sore, I'm hit there." (Tr. 266.) The officers decided to transport Jamamil to Children's Hospital where they met Officer Christina Fox. Jamamil was left in her custody. (Tr. 267.) Officer Conner indicated that he explained to Jamamil about what was going on, that people would be talking to him, and that Jamamil would need to be honest and tell the truth. (Tr. 269.)
{¶ 10} Officer O'Donnell testified that he was notified that a young female had been transferred to Children's Hospital in critical condition with a head trauma following an incident involving water. (Tr. 286.) After obtaining a search warrant, Officer O'Donnell and Detectives Farbacher and Dorn reported to the scene to investigate. Officer O'Donnell testified that the bathtub appeared to be plastic or fiberglass, that there was no standing water in the tub, and that there were small droplets of water by the drain. Officer O'Donnell noticed that the showerhead was leaking. (Tr. 295-298.) Officer O'Donnell also testified that there was a mattress in the hallway leaning up against the wall. (Tr. 305.) After Layla was pronounced dead, Officer O'Donnell attended the autopsy performed by Dr. Fardal. Following the autopsy, defendant was charged with murder. (Tr. 214.) Officer O'Donnell testified that he took custody of Jamamil from the women who came to the apartment. Officer O'Donnell was attempting to comfort Jamamil and make him feel comfortable when he patted the child on the top of his head. Officer O'Donnell discovered that Jamamil's head was red, and when he asked Jamamil what had happened, Jamamil informed him that his dad had hit him on the top of his head. Officer O'Donnell asked Jamamil some questions about what had happened earlier that day, and Jamamil informed him that Layla may have fallen or been hurt by their dad sometime during the day. (Tr. 316-320.) The decision was made to transport Jamamil to Children's Hospital. (Tr. 321.)
{¶ 11} Dr. Dana Hamilton examined Jamamil on July 7, 2001. (Tr. 1044-1045.) Dr. Hamilton asked Jamamil what had happened, and Jamamil indicated that his dad had hit him with his fist. (Tr. 1050.) Jamamil also told Dr. Hamilton that his dad does not like kids but only likes his mom. When asked if he knew how Layla had been injured, Jamamil told Dr. Hamilton that she had been thrown in the tub. (Tr. 1050.) Dr. Hamilton noted that Jamamil had a bruise on the top of his head approximately the size of a silver dollar which was less than 24 hours old. Jamamil informed him that his dad had hit him there with his fist. Jamamil also had a cut on his lip, and Jamamil had said his dad had also hit him there. Dr. Hamilton also noticed a ring-shaped bruise on Jamamil's buttocks which was less than one-week old. Jamamil informed Dr. Hamilton that his dad had hit him there with his hand. (Tr. 1051-1054.) Dr. Hamilton also noted that Jamamil weighed 42-1/2 pounds. (Tr. 1054.)
{¶ 12} Detective Brian Sheline of the Columbus Police Department spoke with defendant and Layla's mother, Safia Dirir, on July 7, 2001. (Tr. 524.) According to Detective Sheline, defendant told him that he had been at home alone with Layla and Jamamil during the day. He placed them in the bathtub with the water running and stepped out into the living room to smoke a cigarette. After a few minutes, Jamamil came out and told defendant that there was a problem with Layla, that she had fallen and hit her head. Defendant indicated that he found her inside the tub and that she was nonresponsive. Defendant carried her to the bedroom, tried to get her attention, and then called 911. He stated that Layla was injured when she fell backwards and hit her head on the tub. (Tr. 524-528.) Detective Sheline also testified that he did not have any difficulty understanding defendant and that he believed defendant understood him as well. (Tr. 531.)
{¶ 13} Jeanie Rosenblum, a pediatric social worker, who is mandated by law to report suspected child abuse cases, had contact with the family. (Tr. 485-495.) Ms. Rosenblum indicated that defendant told her that Layla had fallen backwards in the bathtub and hit her head and that he had attempted CPR. (Tr. 498.) Ms. Rosenblum also spoke with Jamamil, who told her that he had woken up that morning, ate some cereal, and then his mom left. He, his sister, and his dad watched television. Jamamil said that he and his sister then took a bath and that he complained because the water was cold. According to Jamamil, defendant said that it did not matter if the water was cold and that he "liked whopping kids and cutting kid's noses." (Tr. 508.) Jamamil also told Ms. Rosenblum that his dad "whopped us with his fists; it was so hard." Id. Jamamil also told her that defendant does not care about kids but only cares about their mom. According to Ms. Rosenblum, Jamamil told her that defendant then hit Layla and pushed her into the water. (Tr. 508.) Ms. Rosenblum testified that Jamamil told her that defendant put Layla down to make her go to sleep and that he picked her up and threw her down. (Tr. 508-509.) Ms. Rosenblum indicated that Jamamil was alert and very talkative, but sad. (Tr. 511.) When asked on cross-examination if she had any difficulty understanding defendant, Ms. Rosenblum testified that she found it easier to talk to defendant than to Safia because defendant spoke better English. (Tr. 515-516.)
{¶ 14} Columbus Police Detective Steven Eppert testified both at a preliminary hearing on defendant's motion to suppress statements that he made during his interrogation (Tr. 10-81) and at the trial itself. (Tr. 783-963.) During the interrogation, which was viewed by the trial judge, transcribed by the court reporter, and has been viewed by this court, Detective Eppert testified that defendant never told him that he had a problem understanding the English language. (Tr. 12.) Detective Eppert explained to defendant that he was being charged with domestic violence and assault regarding Jamamil and then asked defendant additional questions to ascertain his level of understanding of both the English language, as well as the American judicial system. Detective Eppert read to defendant a portion of the waiver form and had defendant read a portion of the waiver form to him. Detective Eppert testified that he believed that defendant understood his rights and that he voluntarily spoke with the detective and never requested an attorney once the questioning began. (Tr. 16-19.) Detective Eppert noted that he asked defendant to repeat himself a few times, and that defendant also indicated that he had a bachelor's degree from college and had learned to speak English in Somalia. (Tr. 19-20.) On cross-examination, Detective Eppert testified that he did not ask defendant if he needed an interpreter because the defendant appeared to understand what the detective was saying. (Tr. 21.) The trial court viewed the video of defendant's interrogation, and it is transcribed in the record. (Tr. 30-69.) The trial court determined, based upon review of the video, that defendant had voluntarily waived his right to remain silent and did not invoke his right to wait for an attorney. The trial judge also noted that defendant appeared to understand what the detective was saying. (Tr. 79-81.)
{¶ 15} In his trial testimony, Detective Eppert testified that he saw defendant at the hospital. The defendant told him that he had awakened at around 12:30 p.m. that day and that Safia later went out shopping. The children ate and then watched a video. Then, as was customary, defendant drew a bath for the children and placed them in the tub. Defendant told him that he went into the living room to smoke a cigarette. After he took five to six puffs on his cigarette, Jamamil came out of the bathroom and told him that Layla had fallen. Defendant informed the detective that he found Layla in the tub toward the back corner with her face above the water. When asked about the amount of water in the bathtub, defendant indicated that there was approximately six inches of water in the tub. Defendant picked Layla up and took her into the bedroom. He said he thought that she was not breathing and he felt her chest for a heartbeat. He thought that maybe she had slipped on a bar of soap. When asked, defendant informed the detective that he had never seen Jamamil be rough with Layla. He indicated further that he dressed Layla so that she would not be cold. (Tr. 790-796.) According to Detective Eppert, defendant also told him that the children must have drained the bathtub because there was water in the tub when he found Layla. (Tr. 797-798.) Detective Eppert then testified regarding his interview with defendant after defendant had been arrested and charged with domestic violence and felonious assault.
{¶ 16} The trial court viewed the video of defendant's interrogation a second time. (Tr. 803-895.) At first, defendant stated that he never touched the kids at all. (Tr. 816.) Defendant stated that, in his country, it was not acceptable to hit your child anywhere other than on the bottom or the leg. (Tr. 837.) However, defendant did state that sometimes a person gets nervous and then they do not know where they are going to hit the child. (Tr. 837-838.) Thereafter, defendant stated that, on occasion, he has tapped Jamamil on the bottom or the leg. (Tr. 843.) Defendant also told Detective Eppert that, when he was home, the children were better behaved and that they minded him better than they minded their mother. (Tr. 844.) At first, defendant had stated that everyone awoke at approximately 12:30 p.m. on July 7, 2001. (Tr. 847-848.) Later, defendant stated that the children woke up first and that Safia heard a noise and told him to wake up. (Tr. 871-872.) When asked what he did when Jamamil came out and told him that Layla had fallen, defendant originally stated that he grabbed Layla, took her into the bedroom, and immediately called 911. (Tr. 849.) Defendant later told Detective Eppert that he drained the bathtub after the medics arrived. (Tr. 881-882.) At one point in time, defendant told Detective Epert that he dried Layla off and dressed her because it was cold, then later he said that she had dried off all by herself. (Tr. 887.)
{¶ 17} Jamamil testified at trial. The prosecuting attorney began by asking Jamamil some basic questions such as how to spell his last name, how old he was, who he lived with, the age of his cousin and his cousin's name, where he used to live before moving to Columbus, who he lived with before they moved in with his grandmother, what his sister's name was and how old she was, and where his sister was now. Thereafter, when asked how Layla died, Jamamil testified that she was thrown down to the floor in the living room by defendant. (Tr. 685-686.) Jamamil indicated that Layla was thrown down one time and then she died. (Tr. 687.) Jamamil stated that he went to the hospital in a police car. (Tr. 688.) Jamamil testified that defendant had put his hands on Layla's head and pushed her down while they were in the bathtub and that he always hurts him and his sister. (Tr. 689.) He testified that, on another occasion, defendant had thrown him down too, had pushed him under the water, and had hit him. (Tr. 690.) Jamamil indicated that he was telling the truth. (Tr. 692.) On cross-examination, defense counsel asked Jamamil if it was correct that defendant only threw Layla down one time. Jamamil responded that defendant had thrown Layla down ten times. (Tr. 697.) He did indicate that defendant had put his hands on Layla's head and pushed her down under the water. (Tr. 698.) Jamamil indicated that, when they were first in the bathtub, defendant was in the living room. Then he came into the bathroom and put his hands on them. (Tr. 699.) When asked how many times defendant threw him down that day, Jamamil answered "two times." (Tr. 699.) Jamamil also stated that defendant had hit him on his bottom and hit him on his head. (Tr. 700.) Jamamil was asked questions about the mattress in the hallway, and he testified that he and his sister climbed under it and pretended like they were in a cave. (Tr. 704.)
{¶ 18} Safia, Layla and Jamamil's mother, testified that the children took a nap everyday. (Tr. 718.) She testified that, on July 7, 2001, defendant called her on her cell phone and told her that Layla had fallen in the bathtub. She testified that defendant was emotional and that he was crying. (Tr. 723.) Safia testified that Layla had a bump on her forehead from where Jamamil had pushed her and she had hit her head. (Tr. 727-728.) Safia further testified that the defendant is not responsible for physical discipline of the children. (Tr. 729.) Safia also testified that she considers Jamamil to be a truthful child. (Tr. 748.)
{¶ 19} Defendant testified on his own behalf. Defendant testified that Safia woke him up because the children were playing on the mattress. Defendant testified that he told Jamamil many times not to play on the mattress because it might fall and hurt him. Defendant indicated that he then told the children to brush their teeth and sit in the living room, and that the children obeyed. Defendant stated that Safia cooked lunch for them while the children were watching television. Safia cooked pasta and meat and then she left to go shopping around 2 p.m. The children asked him if they could watch the Tarzan videotape, and he put the videotape into the VCR for them. The children watched most of the movie and then defendant fed them lunch. Jamamil asked if he could go outside and play, and defendant told him that he could not because he had to take a bath. Defendant said that he filled the tub up about a quarter of the way and told the children he would be on the couch in the living room and to come get him when they were finished. Defendant left the bathroom door open and stated that he fell asleep on the couch. He indicated that he might have fallen asleep and then woke up and smoked a cigarette. Defendant testified that it had been no longer than 30 minutes when Jamamil came out of the bathroom and said that Layla had hit her head on the bathtub. Defendant took Layla to the bedroom and dressed her because, according to him, you cannot allow a female to be naked. He laid her on the bed and dried her off. He called her name several times but got no response. Then he called 911. Defendant stated that he put her on the floor and took off her shirt as the dispatcher had instructed him. (Tr. 1002-1022.) He further stated that, after the medics arrived and Layla was in good hands, defendant checked the bathroom and let the water out of the bathtub. (Tr. 1023.) Defendant also indicated that he never talked to Massey and did not know why Massey had said he had spoken to him. (Tr. 1024.) Defendant indicated that he cooperated fully with the police and that he had nothing to hide. (Tr. 1032.) Defendant also testified that, during his interview with Detective Eppert, he did not understand anything. He also stated that he did not think Detective Eppert understood him either. (Tr. 1033-1035.) Defendant also testified that Safia had hit Jamamil on the bottom two days earlier because Jamamil had been hitting Layla. (Tr. 1099.) He further testified that Layla hit her forehead two days earlier when Jamamil pushed her, and that Jamamil had hit Layla before. (Tr. 1102-1103.)
{¶ 20} At the conclusion of the evidence, the trial court noted its findings as follows:
THE COURT: Layla Dirir died about midnight on July 7, 2001, as a result of severe head trauma. She had lived with her mother, Safia Dirir; her five-year-old brother, Jamamil; and Safia's live-in boyfriend, Radwan Nasser.
According to Nasser, Safia arose that morning at some time before 11:30 A.M., prepared lunch for the family, to be consumed later in the day. She went shopping with a friend, leaving about one or two o'clock.
The children arose at about 12:30, according to Nasser. The children watched VCR movies, Tarzan, Pinnochio, then he drew water into the bathtub, placed the children into the tub to play. He left them in the tub while he left the room to smoke a cigarette.
At first he said he was gone long enough to take five or six puffs on the cigarette. Later he said that after putting the children in the tub, he laid down on the couch and may have dozed off for something less than one hour.
In any event, he said that Jamamil came out of the bathroom saying Daddy, Daddy, Daddy, Layla is hurt or Layla is in trouble. Nasser said Layla was crying like a baby and that he placed Layla on the floor.
Nasser called 911. He followed the instructions, trying to breathe for Layla. He described her eyes as fixed and unresponsive. The medics were dispatched at 4:50 p.m., arrived at 4:55 p.m.
The medics found the child in very bad condition. Her eyes were fixed and dilated. They were unresponsive to light. Although Nasser claimed that the children had been playing in water, Layla was quite dry, partially dressed in sweat pants. She wore nothing on her feet or on her upper body.
The medics noticed that her hair and clothing were dry, even though Nasser said they had been playing in the tub. Nasser claimed that he had let the water out of the tub. One of the medics found the tub to be perfectly dry.
Jamamil was completely dressed, and he was dry. Nasser related that Jamamil said that she had hit her head — that is Layla — in the tub.
Layla was transported to Children's Hospital, where she was pronounced dead sometime around midnight. Death was not accidental, and, according to the pathologist, was caused by multiple blunt impacts to the head. The pathologist noted a bruise in the center of her forehead and a series of six sub scapular hemorrhages, a three-inch fracture of the occipital bone extending across the midline at the back of the head, and a mild subdural hematoma over the left convexity with very small amounts of blood. There was also a hemorrhage into the right occipital area.
The pathologist, Patrick Fardal, testified that the cause and means of death were nonaccidental. Multiple bruising of the brain and a simple assault does not account for the injuries. The bruises could be from hand blows or shaking impact. All of these injuries occurred contemporaneously.
Dr. Fardal offered no opinion as to whether these injuries could have been caused by a five-year-old or an adult.
Of the injuries present, there were two hematomas consistent with shaken baby syndrome and one fracture. Dr. Fardal said that a fall from the tub would rarely cause a skull fracture. Notwithstanding the fracture, it was unlikely that the child would be unconscious.
A pediatric ophthalmologist examined the child's eyes. She found bilateral retinal hemorrhaging, which almost always comes from acceleration/deceleration forces on a child that is shaken back and forth.
One witness, Arca or Johnson, I think, testified that bilateral retinal hemorrhaging is almost always a consequence of acceleration/deceleration forces. Testimony also indicated that significant force is required, particularly when, as here, the child is three years old or older, the child has therefore developed a stronger neck by the time she is three, better control of her neck muscles.
It is clear that the injuries were inflicted intentionally with significant force, although not so clearly. The evidence indicates that the injuries did not result from a fall in a wet tub, and it is possible that Layla may have been conscious for some period of time after her injuries were inflicted.
Jamamil testified that Nasser threw both of them down on the living room floor. Jamamil had a contusion on his head, a bruise on his bottom, and a small laceration of his lip, all of which he attributed to Nasser.
While the Court had found Jamamil competent to testify, one must be cautious of the testimony of a five-year-old child and his accuracy, but with respect to key factors, he is corroborated. Both children had contusions on their head, even though Nasser claims the children were playing in the tub, in the bathtub with a minimum of about six inches of water. Both children were perfectly dry.
Jamamil testified that Nasser threw him down and threw his sister down in the living room floor and put her to sleep. At some earlier time Nasser had thrown Jamamil down on the living room on his bottom hard enough to result in bruising to his bottom. One of two people, Nasser or five-year-old Jamamil, caused the injuries. A blow to Layla's head resulted in a three-inch fracture across the midline, a blow requiring significant force.
The Court did not believe that Layla was injured from a fall on a partially filled bathtub, as Nasser claims. She and her clothes, at least her hair, would have been wet. The Court concludes that Layla was injured outside of the tub, not from a fall while in the tub.
Nasser needed to concoct some story to account for a head injury, hence, the claim of the bathtub fall. Nasser was the one who ascribed Jamamil coming out of the bathroom saying Layla was hurt, not Jamamil.
In the extreme, unlikely chance that Jamamil was severely abusing his sister that afternoon, Nasser surely would have had to have known about it from Layla's likely screams. the Court believes that Layla was thrown to the floor and may have been shaken as well by Nasser.
Accordingly, the Court finds that the State has met its burden of proof beyond a reasonable doubt as to the remaining counts in the indictment, one count of murder, one of felonious assault, and three counts of endangering children. That is my finding.
(Tr. 1267-1272.)
{¶ 21} Defendant appeared for sentencing on September 10, 2002, and the trial court sentenced him to serve 15 years to life on count three, felony murder, four years on count one, endangering children, four years on count two, felonious assault, and two years on count four, endangering children (counts one through four all involved Layla), and six months as to count six, endangering children, which related to the injuries caused to Jamamil. The trial court ordered that the counts be served concurrent with each other. Thereafter, defendant filed a notice of appeal with this court.
{¶ 22} In his first assignment of error, defendant claims that the trial court erred in failing to appoint an interpreter. Within this context, R.C. 2311.14(A) provides:
Whenever because of a hearing, speech, or other impairment a party to or witness in a legal proceeding cannot readily understand or communicate, the court shall appoint a qualified interpreter to assist such person.
{¶ 23} Furthermore, "in a criminal case the defendant is entitled to hear the proceedings in a language he can understand." State v. Pina (1975), 49 Ohio App.2d 394. "Generally, a trial court has broad discretion to determine whether a criminal defendant requires the assistance of an interpreter." State v. Saah (1990), 67 Ohio App.3d 86. In reviewing a trial court's decision on these matters, an appellate court shall not reverse a trial court's ruling in this regard absent a showing that the trial court acted unreasonably, unconscionably, or arbitrarily. Id.
{¶ 24} Defendant cites United States ex rel. Negron v. New York (1970), 434 F.2d 386, to establish that the accused is entitled to the services of an interpreter under the Sixth and Fourteenth Amendments to the United States Constitution. In Negron, at 389, the court stated as follows:
It is axiomatic that the Sixth Amendment's guarantee of a right to be confronted with adverse witnesses, now also applicable to the states through the Fourteenth Amendment, Pointer v. Texas, 380 U.S. 400 * * * includes the right to cross-examine those witnesses as an "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." Id. at 405 * * *. See also, Bruton v. United States, 391 U.S. 123 * * *; Barber v. Page, 390 U.S. 719, 725 * * *; Douglas v. Alabama, 380 U.S. 415, 418 * * *; Mattox v. United States,156 U.S. 237, 242-243[.] * * * But the right that was denied Negron seems to us even more consequential than the right of confrontation. Considerations of fairness, the integrity of the fact-finding process, and the potency of our adversary system of justice forbid that the state should prosecute a defendant who is not present at his own trial, see, e.g., Lewis v. United States, 146 U.S. 370, 372 * * * unless by his conduct he waives that right. See, e.g., Illinois v. Allen, 397 U.S. 337
* * *. And it is equally imperative that every criminal defendant — if the right to be present is to have meaning — possess "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." Dusky v. United States, 362 U.S. 402 * * * (per curiam). * * * Otherwise, "the adjudication loses its character as a reasoned interaction * * * and becomes an invective against an insensible object." Note, Incompetency to Stand Trial, 81 Harv.L.Rev. 454, 458 (1969).
{¶ 25} In Negron, the defendant was a 23-year-old indigent with a sixth grade Puerto Rican education, who neither spoke nor understood any English. His court-appointed lawyer was not able to communicate with him in Spanish. As such, counsel and client were not able to communicate without the aid of a translator, and Negron was not able to participate in the conduct of his defense in any manner whatsoever. In fact, the court concluded that, to Negron, the majority of the trial must have been a "babble of voices." Id. at 388. Defendant also cites United States v. Osuna (C.A. 10, 1999), 189 F.3d 1289, and asserts that any indication to the trial court that the accused speaks primarily a language other than English triggers the court's duty to conduct an appropriate inquiry into the need for an interpreter. In Osuna, the defendant's native language was Spanish, but he did also speak English. However, the court noted that the state had utilized an interpreter in the police sting operation, which had resulted in the defendant's arrest. The defendant did testify at trial, and the court noted that his testimony caused "severe confusion" in part because of the rapidity of his testimony and his Spanish-speaking background. Id. at 1292. The court noted that there were at least 14 instances where the court reporter was not able to understand the defendant. Furthermore, in Osuna, the court noted that the decision to waive the use of an interpreter is not a decision for counsel or the court to make; it is the defendant's decision to make. Id.
{¶ 26} In the present case, the trial court viewed the interrogation of defendant conducted by Detective Eppert. This court has also had the opportunity to review that videotape. The trial court noted, and this court agrees, that it is clear that defendant was able to understand what Detective Eppert was asking him, and that Detective Eppert understood him as well. Defendant testified at trial, and neither counsel nor the trial court had any difficulty understanding him. Defendant did utilize an interpreter twice during his testimony. The first time occurred during direct examination when defendant was describing the children jumping on the mattress. Defendant needed the interpreter to find the word "trampoline." (Tr. 1001.) The second time defendant requested the aid of an interpreter was during cross-examination when the prosecutor asked him a multi-part question. (Tr. 1163-1164.) Furthermore, this court notes that the court reporter did not have any difficulty transcribing the interrogation of defendant by Detective Eppert, defendant's 911 call, and defendant's testimony in front of the court. Clearly, this record does not show that defendant's lack of an interpreter inhibited his comprehension of the proceedings or his ability to assist in presenting his case to the jury. See Negron and Osuna, supra. Furthermore, the record indicates that defense counsel spoke with defendant at length following the pretrial hearing. Defendant indicated that he understood enough of what was going on that he did not need an interpreter until or unless he testified. (Tr. 93.) As indicated previously, the decision to waive the use of an interpreter is to be made by the defendant, and defendant did so in this case.
{¶ 27} For all the foregoing reasons, this court overrules defendant's first assignment of error.
{¶ 28} In his second assignment of error, defendant argues that the trial court erred when it failed to conduct an in-depth inquiry as whether defendant was making a knowingly, intelligent, and voluntary waiver of his right to a jury trial, and especially in light of defendant's difficulty with the English language and his lack of familiarity with the American judicial system.
{¶ 29} It is undisputed that the right to have a jury decide the guilt or innocence of an accused is one of the distinguishing features of the American criminal justice system. The legal authorities applicable in making a determination regarding jury waiver began with Crim.R. 23(A) and R.C. 2945.05. Crim.R. 23(A) provides, in pertinent part, as follows:
In serious offense cases the defendant before commencement of the trial may knowingly, intelligently and voluntarily waive in writing his right to trial by jury. * * *
{¶ 30} R.C. 2945.05 provides, as follows:
In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof. It shall be entitled in the court and cause, and in substance as follows: "I ___, defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury."
Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial.
{¶ 31} In State v. Johnson (1992), 81 Ohio App.3d 482, 488, this court cited with approval Simmons v. State (1906), 75 Ohio St. 346, wherein the Ohio Supreme Court stated:
"* * * [e]very reasonable presumption should be made against the waiver, especially when it relates to a right or privilege deemed so valuable as to be secured by the Constitution." * * *
{¶ 32} The trial court is not required to interrogate a defendant in order to determine whether a waiver of the jury right is knowing, intelligent, and voluntary; instead, facial compliance with R.C. 2945.05
has been found to satisfactorily demonstrate the ability of a waiver. State v. Jells (1990), 53 Ohio St.3d 22. In Jells, the Ohio Supreme Court stated:
There is no requirement in Ohio for the trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial. The Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with counsel. * * *
Id. at 25-26. See, also, State v. Haight (1994), 98 Ohio App.3d 639.
{¶ 33} In the present case, defendant's waiver of his right to a jury trial was made in open court after defendant had been arraigned and had consulted with counsel. The waiver was written and signed by defendant in open court, filed, and made a part of the record on appeal. (Tr. 91-97.) Defense counsel specifically stated that, following his consultations with defendant, he was satisfied that, if defendant did waive his right to a jury trial, that his waiver was done knowingly, intelligently, and voluntarily.
{¶ 34} The following exchange took place between the trial court and defendant:
THE COURT: Okay. One of the requirements of a knowing and intelligent waiver under statute is that after I ascertain what he wants to do, and presuming he wants to proceed to with [sic] a trial to the Court, this has to be filed with the clerk of courts before we begin our proceedings.
MR. BELINKY: Yes; Your Honor.
THE COURT: So I want to go over it just briefly with Mr. Nasser.
Mr. Nasser, my understanding is from the form I see here is that you want to waive and relinquish your right to trial by jury. Is that right?
THE DEFENDANT: Yes, sir.
THE COURT: And you want to be tried by a judge in this case me?
THE DEFENDANT: Yes, sir.
THE COURT: Do you understand that you have an absolute constitutional right to a trial by jury?
THE DEFENDANT: Yes, sir.
THE COURT: Now, in order for you to be found either not guilty or guilty in front of a jury, all 12 jurors would have to agree. If they didn't agree, it wouldn't be a trial, what we call a mistrial. If you try it to me, that won't happen. I've got to decide one way or the other guilty or not guilty. So you can't have — you can have a hung jury we call it. Do you know that expression?
THE DEFENDANT: No, sir.
THE COURT: Well, it's when they can't agree. If they can't agree then the Court would abort the trial and possibly start over, possibly not. I just want to make sure you understand that, that if you try it to me, then there's no possibility of my not making a decision. I have to do that. Where if you try it to 12 people maybe no decision would come out. That's a possibility. I don't know if I can say it's likely or not. But it's something that I think you should consider. Do you understand that?
THE DEFENDANT: Yes, sir.
THE COURT: Do you still want to proceed by trial to me? Or the jury?
THE DEFENDANT: You.
THE COURT: To me, Okay. I need some signatures on here.
(Tr. 93-95.)
{¶ 35} Part of defendant's argument hinges on his continued assertion that the record reflects that he had substantial difficulty with the English language and demonstrated that he lacked familiarity with the American judicial system. This court already discussed those issues within the context of defendant's first assignment of error and found that the record demonstrated that defendant understood English well, was able to communicate in English, was able to understand questions posed to him in English, and that he had sufficient understanding of the American judicial system. Defendant contends that United States v. Duarte-Higareda (C.A. 9, 1997), 113 F.2d 1000, wherein the court determined that the defendant's language barrier was sufficiently analogous to a prior case the court had considered involving a mentally unstable defendant, is remarkably similar to the present case. However, the present factual situation is not analogous to the Duarte-Higareda case. In Duarte-Higareda, defense counsel had stated that he discussed the waiver of a jury trial with the defendant and that they concluded that it would be beneficial for the defendant to waive his right to a jury trial. Counsel continued by noting that this would enable him to devote more of his time to a rape trial involving one of his other clients. Furthermore, on the day of trial, the trial court never questioned the defendant about the waiver and, instead, simply proceeded to try him without a jury. On review, the federal court found it particularly relevant that the defendant required the use of a Spanish interpreter throughout the district court proceedings and that this should have put the district court on notice that defendant may not have understood the waiver he had executed entirely in English. However, in the present case, defendant clearly understood English. The trial court had viewed the videotape of defendant's interrogation with Detective Eppert and personally addressed defendant in court pursuant to R.C. 2945.05. Furthermore, unlike the Duarte-Higareda decision, defendant himself, in open court, waived his right to a jury trial.
{¶ 36} Based on the foregoing, defendant's second assignment of error is not well-taken and is overruled.
{¶ 37} In his third assignment of error, defendant argues that the trial court abused its discretion in determining that Jamamil, who was six-years old at the time of the trial, was competent to testify. Defendant contends that the trial court failed to conduct an adequate inquiry into Jamamil's competency, the trial court restricted defense counsel's examination of his competency, and the court allowed Jamamil to testify, despite indications that he was incapable of receiving just impressions of the facts and circumstances and of relating them truthfully.
{¶ 38} Evid.R. 601(A) provides that every person is competent to be a witness except those of unsound mind and children under the age of ten who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined or of relating them truly. The rule favors competency and confers it even on those who do not benefit from the presumption, such as children under the age of ten, provided they are shown to be capable of receiving just impressions of the facts and transactions respecting which they are examined and capable of relating them truly. See Turner v. Turner (1993), 57 Ohio St.3d 337,343.
{¶ 39} In State v. Clark (1994), 71 Ohio St.3d 466, 469, the Supreme Court of Ohio stated as follows:
The presumption established by Evid.R. 601(A) recedes in those cases where a witness is either of unsound mind or under the age of ten. In such cases, the burden falls on the proponent of the witness to establish that the witness exhibits certain indicia of competency. This court established a test for determining competency in State v. Frazier (1991), 61 Ohio St.3d 247 * * * syllabus, certiorari denied (1992),503 U.S. 941, 112 S.Ct. 1488 * * *. There, we held that in determining whether a child under ten is competent to testify, the trial court must take into consideration: the child's ability to receive accurate impressions of fact, the child's ability to recollect those impressions, the child's ability to communicate what is observed, the child's understanding of truth and falsity, and the child's appreciation of his or her responsibility to tell the truth. Once a trial judge concludes that the threshold requirements have been satisfied, a witness under the age of ten will be deemed competent to testify. * * *
{¶ 40} Thereafter, in State v. Said (1994), 71 Ohio St.3d 473,476, the Ohio Supreme Court again cited its decision in State v. Frasier (1991), 61 Ohio St.3d 247, and stated as follows:
* * * Competency under Evid.R. 601(A) contemplates several characteristics. See * * * Frazier * * *. Those characteristics can be broken down into three elements. First, the individual must have the ability to receive accurate impressions of fact. Second, the individual must be able to accurately recollect those impressions. Third, the individual must be able to relate those impressions truthfully. * * *
{¶ 41} Furthermore, it is well-settled that, as the trier of fact, trial judges are required to make a preliminary determination as to the competency of all witnesses, including children and that, absent an abuse of discretion, competency determinations of the trial judge will not be disturbed on appeal. Clark, supra, at 469; Frazier, at 251.
{¶ 42} Defendant argues that the trial court's voir dire examination of Jamamil was confined solely to the fourth and fifth factors enunciated in Frazier; i.e., the child's understanding of the difference between the truth and a lie and the adverse consequences of telling a lie. Defendant contends that the court did not consider the child's ability to receive accurate impressions of fact or to observe acts about which he would testify, his ability to recollect those impressions or observations, or his ability to communicate what was observed. For the reasons that follow, this court disagrees.
{¶ 43} The trial court conducted a hearing regarding Jamamil's competency. The prosecutor began by pointing to the trial judge and asking Jamamil if he knew who he was. Jamamil answered that it was the judge. (Tr. 83.) Thereafter, the following exchange took place between the trial court judge and Jamamil:
THE COURT: What's your name?
THE WITNESS: Isaisiaih Jamamil.
THE COURT: Is your mommy here?
THE WITNESS: Yeah.
THE COURT: Where's your mom? Do you see your mommy?
THE WITNESS: No.
THE COURT: Oh, you don't. Maybe she could wave her hand. What's your mommy's name?
THE WITNESS: Safia.
THE COURT: Do you know any of these other people that you see out there?
THE WITNESS: No.
THE COURT: Nobody?
THE WITNESS: Nobody.
THE COURT: Do you go to school? Do you go to kindergarten or —
THE WITNESS: I go to kindergarten.
THE COURT: Do you go to kindergarten?
THE WITNESS: (Nods head).
THE COURT: How long have you been doing that?
THE WITNESS: 18 years.
THE COURT: How long?
THE WITNESS: 18 years.
THE COURT: Sounds like 18 years. I doubt it. Okay. Do you know why you're here?
THE WITNESS: I don't know.
THE COURT: You don't know. Are you going to answer some questions? If people ask you questions will you answer the question?
THE WITNESS: Yes.
THE COURT: Okay. Where do you go to kindergarten?
THE WITNESS: What you say?
THE COURT: Where do you go to kindergarten? Is it close to where you live?
THE WITNESS: No.
THE COURT: How do you get there?
THE WITNESS: By a bus.
THE COURT: Oh, by a bus?
THE WITNESS: Yes.
THE COURT: Do you go by yourself or somebody go with you?
THE WITNESS: Everybody with me and my friends.
THE COURT: Uh-huh. Do you know what it means to tell a lie?
THE WITNESS: Yeah.
THE COURT: Do you know what that means?
THE WITNESS: Yes.
THE COURT: Is it good or bad to tell a lie?
THE WITNESS: It's bad to tell a lie.
THE COURT: Is it good to tell the truth?
THE WITNESS: Yes, it's good to tell the truth.
THE COURT: Now, if I said I just saw a kangaroo in the back door there, would that be a truth or a lie?
THE WITNESS: A lie.
THE COURT: Wouldn't be no kangaroo, would there?
THE WITNESS: Because there's no kangaroos here.
THE COURT: What's that?
THE WITNESS: No kangaroos here.
THE COURT: Okay. What did you learn in school? Did you learn anything about spelling?
THE WITNESS: I learn from what is five plus five.
THE COURT: Oh, did you?
THE WITNESS: Yes.
THE COURT: What is five plus five?
THE WITNESS: Five plus five, ten.
THE COURT: That's good. Do you know your ABCs?
THE WITNESS: Yes.
THE COURT: How many do you think?
THE WITNESS: All of them.
THE COURT: Well, let's hear.
THE WITNESS: A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, V, W, X, Y, Z. And I know my 1, 2, 3.
THE COURT: That's very good. What would happen if you tell a lie under oath? Would that be bad?
THE WITNESS; It would be bad.
THE COURT: Would you tell the truth in here?
THE WITNESS: Yes.
THE COURT: Everything the truth?
THE WITNESS: Yeah.
THE COURT: Do you promise to tell the truth?
THE WITNESS: Yes. Yes.
(Tr. 84-88.)
{¶ 44} The trial judge asked whether either the prosecutor or defense counsel had any questions they wanted to ask. In chambers, defense counsel informed the trial court that he wanted to ask Jamamil some questions regarding his recollection of the events of July 7, 2001, whether Jamamil remembered who interviewed him within the first 72 hours after he was taken into police custody, how often Jamamil had talked to the police and the prosecutor's office before he had the chance to go back to his mother, and what they talked about. The trial judge refused to allow defense counsel to ask those questions and found that Jamamil was competent to testify.
{¶ 45} The Ohio Supreme Court has affirmed a trial court's finding of competency in cases where the competency hearing did not involve any questions about the crime at issue. See, for example, State v. McNeill (1998), 83 Ohio St.3d 438, and State v. Allard (1996), 75 Ohio St.3d 482, wherein the questions asked of the child witness were very similar to the questions asked to Jamamil in this case. In Kentucky v. Stincer (1987),482 U.S. 730, 107 S.Ct. 2658, the United States Supreme Court considered whether the exclusion of a defendant from a hearing held to determine the competency of two child witnesses violated his rights under the Confrontation Clause to the Sixth Amendment or the Due Process Clause of the Fourteenth Amendment. In concluding that the defendant's due process rights were not violated, the court emphasized:
[T]he particular nature of the competency hearing. No question regarding the substantive testimony that the two girls would have given during trial was asked at that hearing. All the questions, instead, were directed solely to each child's ability to recollect and narrate facts, to her ability to distinguish between truth and falsehood, and to her sense of moral obligation to tell the truth. * * *
Id. at 745. The court also noted that, although a preliminary determination of a witness's competency to testify is made at a competency hearing, the determination of competency is an ongoing one for the judge to make based on the witness's actual testimony at trial. Id. at 740. Furthermore, the court noted that, when reviewing a trial judge's determination of competency, appellate courts will also look to the full testimony at trial. Id. at 743.
{¶ 46} Based upon a review of the exchange at the competency hearing in Jamamil's testimony itself, this court finds the trial court did not abuse its discretion. As the Ohio Supreme Court stated in Said, supra, the characteristics which must be determined in order to establish competency can be broken down into three elements. First, the child must have the ability to receive accurate impressions of fact. Second, the child must be able to accurately recollect those impressions. And third, the child must be able to relate those impressions truthfully. This court concludes that the questions asked Jamamil by the trial court satisfied the factors enunciated in Frazier. Furthermore, any inconsistencies during Jamamil's testimony at trial would affect the weight and credibility of his testimony, not its admissibility.
{¶ 47} Based upon the foregoing, defendant's third assignment of error is not well-taken and is overruled.
{¶ 48} In his fourth assignment of error, defendant contends that the trial court erred when it permitted Ms. Rosenblum, the pediatric social worker, and Dr. Hamilton, the physician who examined Jamamil, to testify regarding statements Jamamil made implicating defendant in Layla's death. Defendant contends that those statements were not made for purposes of medical diagnosis or treatment of either Jamamil or Layla.
{¶ 49} In State v. Dever (1992), 64 Ohio St.3d 401, 404, the Ohio Supreme Court opened its decision with the following statements:
This case presents the continuing problem of reaching just results in child abuse cases involving statements made by young children during the course of a medical examination. We must consider the admissibility of the statements at trial pursuant to the hearsay exception contained in Evid.R. 803(4). The principal dilemma arises in attempting to apply to children evidentiary rules which were drafted with adults in mind. In applying these rules of evidence to children, we encounter considerable problems in devising a reasonable and workable application. Nevertheless, we continue to strive for balance in this troublesome area of the law. As was noted in State v. Boston, supra, 46 Ohio St.3d at 113
* * *: "* * * [I]t is the goal of all the members of the judiciary that results are reached that are equitable and fair to both society and defendants who find themselves charged with the crime of child abuse."
{¶ 50} Evid.R. 803(4) provides a hearsay exception applicable regardless of the availability of the declarant, and allows for the admission of:
Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
{¶ 51} The Staff Notes to Evid.R. 803(4) note that the underlying rationale for this exception is:
* * * derived from the assumption that a person will be truthful about his physical condition to a physician because of the risk of harmful treatment resulting from untruthful statements. * * *
* * *
The exception is limited to those statements made by the patient which are reasonably pertinent to an accurate diagnosis and should not be a conduit through which matters of no medical significance would be admitted.
See, also, State v. Clary (1991), 73 Ohio App.3d 42.
{¶ 52} Defendant contends that certain statements made by Jamamil to the social worker, Ms. Rosenblum, and his treating physician, Dr. Hamilton, were not admissible. Clearly, Evid.R. 803(4) would apply to a physician. A social worker is also permitted to testify, pursuant to Evid.R. 803(4), if the social worker encountered the witness for the purpose of medical diagnosis and treatment. See State v. Chappell (1994),97 Ohio App.3d 515. Defendant does not object to the testimony of Ms. Rosenblum and Dr. Hamilton concerning Jamamil's statements to them regarding the manner in which he sustained his injuries. Instead, defendant only challenges those portions of the record wherein the witnesses were permitted to testify concerning Jamamil's statements explaining how Layla sustained her injuries. Defendant contends that Jamamil's statements were not made for purposes of medical diagnosis and treatment and were not admissible under Evid.R. 803(4).
{¶ 53} Preliminarily, it is important to note that defense counsel did not object to Dr. Hamilton's testimony concerning Jamamil's statements. Defense counsel did object to testimony given by Ms. Rosenblum concerning Jamamil's statements to her regarding how Layla sustained her injuries. The trial court determined that the statements went to diagnosis and treatment only and permitted the testimony from Ms. Rosenblum. (Tr. 507.)
{¶ 54} Both Dr. Hamilton and Ms. Rosenblum testified that Jamamil told them that Layla had been thrown down in the bathtub. (Tr. 508; 1049.) In State v. Dumas (Feb. 18, 1999), Franklin App. No. 98AP-581, this court concluded that Evid.R. 803(4) does not require that a statement made for medical purposes be made by the patient. In fact, some courts have found that the rule does not require that the statement concern the declarant's condition, and statements by others, most often close family members, may be received if the relationship or the circumstances give appropriate assurances. See McCormick, Evidence (5 Ed., West Ed. 1999), 235, Section 277:
See United States v. Yazzie, 59 F.3d 807, 813 (9th Cir. 1995) (in most circumstances, statements by parent of injured child to doctor will qualify); State v. Huntington, 575 N.W.2d 268, 277-78 (Wis. 1998) (statement by child to mother regarding sexual abuse relayed by mother to nurse); McKenna v. St. Joseph Hosp., 557 A.2d 854 (R.I. 1989) (statements by bystanders to emergency personnel that man was driving erratically and then wandered into street admissible under exception as well as subsequent repetition of those statements to emergency room staff). * * *
{¶ 55} The test for admissibility is whether the subject matter of the statements is reasonably pertinent to diagnosis or treatment. Id.
{¶ 56} The trial court has broad discretion in determining whether an out-of-court statement fits within the hearsay exception. Dever, supra, at 410. Furthermore, an abuse of discretion will be found only if the trial court's attitude was unreasonable, arbitrary, or unconscionable. Id.
{¶ 57} Upon review, this court finds the trial court did not abuse its discretion in permitting the testimony. Furthermore, there is a presumption in a criminal bench trial that the trial judge will only consider relevant evidence. State v. Fautenberry (1995), 72 Ohio St.3d 435; State v. Post (1987), 32 Ohio St.3d 380.
{¶ 58} Defendant has shown neither plain error nor an abuse of discretion, and his fourth assignment of error is therefore overruled.
{¶ 59} In his fifth assignment of error, defendant contends that the trial court committed plain error when it permitted hospital physicians to offer improper opinion testimony that Layla's injuries were intentionally inflicted. Defendant contends that, by being permitted to testify that Layla's injuries were intentionally caused as opposed to accidentally caused, the physicians were permitted to testify as to the existence of the culpable mental state for the charged offenses. This court disagrees.
{¶ 60} Evid.R. 702 provides as follows:
A witness may testify as an expert if all of the following apply:
(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validity derived from widely accepted knowledge, facts, or principles;
(2) The design of the procedure, test, or experiment reliably implements the theory;
(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
{¶ 61} Pursuant to Evid.R. 705:
The expert may testify in terms of opinion or inference and give his reasons therefore after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise.
{¶ 62} Furthermore, Evid.R. 704 provides that:
Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact.
{¶ 63} The decision to admit the testimony of an expert, once qualified, is within the sound discretion of the trial court. State v. Williams (1996), 74 Ohio St.3d 569. Defendant did not object to the introduction of the medical examiner's opinions as to the cause of Layla's death, and defendant has waived all but plain error with respect to this evidence. Plain error is recognized only where, but for the alleged error, the outcome of the trial would have been different. State v. Long (1978), 53 Ohio St.2d 91.
{¶ 64} All of the doctors testified that Layla's death was caused intentionally as opposed to accidentally. (Tr. 550-551, 558-560, 584-585, 590.) Dr. Marjorie Arca is employed as a pediatric surgeon at Children's Hospital. She is board-certified in general surgery, critical surgery, and pediatric surgery. (Tr. 353-354.) Dr. Arca is mandated by law to report suspected child abuse cases. (Tr. 393.) Dr. Arca is qualified to express an opinion as to how Layla's injuries were caused. Dr. Mary Lou McGregor is a pediatric ophthalmologist, and she testified that, in both medical school and in ophthalmology training, doctors are taught that hemorrhages in the eye are a result of non-accidental trauma until proven otherwise. (Tr. 755-756.) Based upon her education and knowledge, she was qualified to testify as to her knowledge of medical protocal and her area of expertise. Dr. Charles Johnson is a pediatrician who directs the child abuse trauma unit at Children's Hospital. He is also mandated by law to report suspected child abuse cases. He opined that Layla's injuries had been caused intentionally, and he based this upon the fact that there were multiple impact sights and evidence of acceleration/deceleration or shaking. (Tr. 594, 606.) Dr. Patrick Fardal, the Franklin County Coroner, testified that the multiple injuries to Layla's skull, plus the retinal hemorrhages, led him to the conclusion that there had been multiple injuries to her head. Based upon his expertise, Dr. Fardal concluded that her death was a homicide and that it was non-accidental. (Tr. 549-550, 589-590.)
{¶ 65} Contrary to defendant's assertions, none of the witnesses offered an opinion as to the offender's culpable mental state as such is defined in R.C. 2901.22. Defendant argues that Dr. Fardal conceded that the retinal hemorrhages could have been caused by a single fall or by defendant's administration of CPR to the child. However, a review of Dr. Fardal's testimony demonstrates that Dr. Fardal conceded that there was a remote possibility that the skull fracture, the bruising on the front of the brain, and the retinal hemorrhages may all have been caused by a single traumatic event; however, he stated that a single event could not also account for the hemorrhages on the subscapulor tissues on the front and sides of her head. (Tr. 549-551, 548-585, 590.) Furthermore, he specifically testified that a fall in the bathtub could account for the first set of injuries; however, it would not account for the other head injuries. (Tr. 550-553.) Dr. Fardal's testimony was not sufficient to give a reasonable doubt of defendant's guilt as defendant claims.
{¶ 66} As such, defendant's fifth assignment of error is not well-taken and is overruled.
{¶ 67} In his sixth assignment of error, defendant contends that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. Specifically, defendant asserts that a rational trier of fact could not have concluded beyond a reasonable doubt that defendant either recklessly violated a duty of care owed to Layla or purposely abused her and knowingly caused harm to Layla. Defendant concedes the state's evidence indicated Layla suffered trauma that caused several subdural hemotomas, a fracture of her skull, and retinal hemorrhages, which may have occurred while the children were in his care. Defendant contends, however, that there are at least three equally plausible scenarios under which Layla could have suffered her fatal injuries: (1) she was shaken and thrown to the floor as argued by the state; (2) she was pushed by her brother and hit her head on the bathtub; or (3) she accidentally slipped and fell and hit her head on the bathtub.
{¶ 68} Under R.C. 2919.22(A), the state was required to prove beyond a reasonable doubt that: (1) defendant was the parent, guardian, custodian, person having custody or control, or person in loco parents of Layla, and (2) defendant recklessly violated a duty of protection, care, or support imposed by law, which created a substantial risk to the health or safety of Layla. State v. McGee (1997), 79 Ohio St.3d 193. Defendant does not contest the trial court's finding that his conduct resulted in serious physical harm to Layla.
{¶ 69} A conviction under R.C. 2919.22(B)(1) required the state to prove beyond a reasonable doubt that (1) Layla was under 18 years of age; (2) an affirmative act of abuse occurred; and (3) defendant recklessly committed the act of abuse. State v. Burdine-Justice (1998),125 Ohio App.3d 707; State v. Ivey (1994), 98 Ohio App.3d 249. Again, defendant does not challenge the trial court's finding that serious physical harm resulted to Layla.
{¶ 70} The culpable mental state for the crime of endangering children under both statutory subsections is recklessness. McGee, supra, at 195. Pursuant to R.C. 2901.22(C), "[a] person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result * * *[.]" Further, "[w]hen recklessness suffices to establish an element of an offense, then knowledge or purpose is also sufficient culpability for such element." R.C. 2901.22(E).
{¶ 71} A conviction under R.C. 2903.11(A) required the state to prove beyond a reasonable doubt that (1) serious physical harm occurred to Layla, and (2) defendant knowingly caused that harm. Pursuant to R.C.2901.22(B), "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result * * *[.]" "When knowledge suffices to establish an element of an offense, then purpose is also sufficient culpability for such element." R.C.2901.22(E).
{¶ 72} When presented with a sufficiency of the evidence argument, this court construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259. According to the state's evidence, Layla was a healthy three-and-one-half-year-old girl at the time her mother left her in defendant's care. She was three-feet tall and weighed 41 pounds. According to the autopsy report, Layla suffered several significant blunt force traumas to her head, one of which resulted in a fracture of her skull; Layla also suffered subdural hematomas, and subarachnoid hermorraging, as well as retinal hemorrhages in both eyes. Drs. Arca, Fardal, Johnson, and McGregor all testified that the retinal hemorrhages were indicative of acceleration/deceleration injuries commonly known as shaken baby syndrome. All four doctors testified that, based upon the multiple injuries, as well as the retinal hemorrhages, the injuries sustained to Layla were not accidental, and had been intentionally caused. Dr. Arca testified that, while a fall in the bathtub could have generated the skull fracture, the significant brain swelling was not consistent with a single blunt impact force, and that the subdural hemorrhaging was too distant from the fracture sight to have been caused by the fall in the tub. Furthermore, a fall in the tub would not have caused the retinal hemorrhages. Drs. Fardal and Johnson both agreed. Dr. Fardal testified that a fall in the bathtub would account for one set of injuries but would not account for the other head injuries and the retinal hemorrhages. Dr. Johnson testified that it was highly unlikely that Layla fractured her skull when she struck her head on the bathtub, but it was possible. However, he stated that death would have been highly unlikely. Furthermore, one fall did not account for the other multiple injuries to her head and the retinal hemorrhages.
{¶ 73} While defendant argues that there is no direct evidence that he abused Layla, other than Jamamil's testimony, it is well-settled that circumstantial evidence and direct evidence inherently possess the same probative value. Jenks, supra. Furthermore, it is not unusual that evidence of shaken baby syndrome may be primarily circumstantial, especially where a child is in the sole custody of one adult at the time the injuries are sustained. See State v. Gulertekin (Dec. 3, 1998), Franklin App. No. 97APA12-1607 (sufficient circumstantial evidence to support conviction of child endangering where an infant suffered injuries consistent with shaken baby syndrome while entrusted to the defendant's care); State v. Williams (Mar. 5, 1992), Franklin App. No. 91AP-653 (sufficient circumstantial evidence to support conviction of child endangering where there was medical expert testimony that an infant was injured as a result of abuse and where the defendant was the primary caretaker for the infant immediately proceeding the manifestation of the infant's injuries).
{¶ 74} Construed in the state's favor, the evidence was sufficient to allow the trial court to find beyond a reasonable doubt that defendant violated R.C. 2919.22(A), (B)(1), and 2903.11.
{¶ 75} Defendant also asserts that the verdict is against the manifest weight of the evidence. As in his allegation of error regarding the sufficiency of the evidence, defendant acknowledges that, at best, the weight of the evidence presented at trial demonstrates that Layla's injuries likely, but not definitely, occurred as argued by the state. Defendant, however, asserts that it was equally likely that Layla was either pushed by her brother and hit her head or accidentally slipped and hit her head.
{¶ 76} When presented with the manifest weight argument, this court engages in a limited weighing of the evidence to determine whether the verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230.
{¶ 77} While the doctors who testified did agree that retinal hemorrhages could be caused by a single blunt force trauma, they all concurred that a fall in the bathtub would not have been a sufficient enough force to have caused the retinal hemorrhages. Furthermore, all of the doctors agreed that a single traumatic event would not account for the multiple head injuries, the degree of brain swelling, and the retinal hemorrhages. Specifically, Dr. Fardal testified that it takes between 400 and 600 pounds of force per square inch to fracture a human skull. (Tr. 552.) All of the doctors testified that it was highly unlikely that the skull fracture was caused by a slip-and-fall in the bathtub. Furthermore, Dr. Johnson testified that it was highly unlikely that a five-year-old child would have had the strength to have inflicted the injuries to Layla.
{¶ 78} Substantial competent, credible evidence was presented by which the trial court reasonably could find that defendant recklessly or intentionally abused Layla and recklessly failed to protect her from serious physical harm. Furthermore, substantial competent, credible evidence was presented by which a trial court reasonably could find that defendant knowingly caused serious physical harm to Layla. The medical evidence presented identifying the cause of Layla's death could not be explained by defendant's explanation.
{¶ 79} The trial court's decision was not against the manifest weight of the evidence, and defendant's sixth assignment of error is overruled.
{¶ 80} In his seventh assignment of error, defendant argues that he was denied his right to effective assistance of counsel. Defendant contends that his trial counsel failed to insure that he had an interpreter at the trial. Defendant also argues that Jamamil's hearsay statements were inadmissible and that the medical experts' opinions that he acted intentionally were also inadmissible and that both played a significant role in the outcome of this case. As such, defendant argues that there is a reasonable probability that, but for defense counsel's errors in failing to object to this testimony and in failing to insure that he had an interpreter, the outcome of the trial would have been different.
{¶ 81} In Strickland v. Washington (1984), 466 U.S. 668, 667,104 S.Ct. 2052, the United States Supreme Court established a two-prong analysis for determining whether counsel's assistance was so defective as to require a reversal of conviction:
* * * First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. * * *
{¶ 82} The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. The proper standard of attorney performance is that of reasonably effective assistance. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. The defendant carries the burden of showing that counsel's deficient performance prejudiced his trial. Id. at 687-691. The burden is met where the reviewing court finds, given the totality of the evidence, that, but for counsel's errors, the verdict would reasonably have been different. Id. at 691-696.
{¶ 83} Defendant first argues that his counsel erred in failing to insure that an interpreter was available for the entire trial. As this court noted in addressing defendant's first assignment of error, the evidence before the trial court indicated that defendant had a sufficient grasp of the English language and that there was no need for further inquiry regarding the aid of an interpreter. Furthermore, defense counsel indicated that defendant himself did not believe that he needed an interpreter and that he had sufficiently understood everything that had taken place at the pretrial hearing. Defendant was college educated and had stated that he learned English in school while growing up. Both the trial court and this court viewed the interrogation of defendant with Detective Eppert and noted that neither defendant nor Detective Eppert had difficulty in comprehending each other. Furthermore, the court reporter did not have any difficulty transcribing either the videotape of the interview or defendant's testimony at trial. Defendant has not shown that counsel's performance was deficient in any regard with respect to whether an interpreter was needed.
{¶ 84} Regarding counsel's failure to raise certain objections, failure to object alone is not enough to sustain a claim of ineffective assistance of counsel. State v. Fears (1999), 86 Ohio St.3d 329. As stated previously, the medical experts did not testify as to defendant's culpable mental state. Instead, they testified that, based upon the multiple injuries to Layla, including the retinal hemorrhages, the cause of her injuries was non-accidental. Their testimony was permissible under Evid.R. 702, and counsel did not render ineffective assistance by not objecting to this testimony. Furthermore, even if Jamamil's statements to medical personnel and the social worker had been inadmissible at trial under Evid.R. 803(4), this court finds that the statements were merely cumulative to his trial testimony and harmless beyond a doubt. There was sufficient medical evidence of defendant's guilt without evidence of Jamamil's statement to the medical personnel and the social worker, including his trial testimony, to support defendant's convictions. Where the evidence complained of is harmless, there is no prejudice, and reversal is unwarranted. State v. Moritz (1980), 63 Ohio St.2d 150. Defendant has not demonstrated that his defense counsel rendered ineffective assistance of counsel.
{¶ 85} Defendant's seventh assignment of error is therefore not well-taken and overruled.
{¶ 86} Based on the foregoing, all seven of defendant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Brown, J., concurs separately.