[Cite as *Estate of Fleenor v. Ottawa Cty.*, 2021-Ohio-2251.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

Estate of Jennings Fleenor

Appellant

Court of Appeals No. OT-20-023

Trial Court No. 2018CV238

v.

County of Ottawa

Appellee

**DECISION AND JUDGMENT**

Decided: June 30, 2021

* * * * *

William B. Eadie and Michael A. Hill, for appellant.

Teresa L. Grigsby and Jennerifer A. McHugh, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Plaintiff-appellant, the Estate of Jennings Fleenor, appeals the September 3, 2020 judgment of the Ottawa County Court of Common Pleas, granting summary judgment in favor of defendant-appellee, the County of Ottawa, d/b/a Ottawa County Riverview Nursing Home. For the following reasons, we reverse.

## I. Background

### A. Factual Background

{¶ 2} Jennings Fleenor was a 77-year-old man who resided at Ottawa County Riverview Nursing Home. On the evening of July 29, 2016, nurse aide, T.M., was preparing to shower Fleenor, a bilateral leg amputee who also suffered from dementia, diabetes, peripheral vascular disease, among other conditions. She and another aide used a Hoyer lift to transfer him from his wheelchair to a rollable shower chair. Once in the shower chair, T.M. situated herself facing Fleenor and began pushing the chair into the shower when it tipped backwards. T.M. grabbed the arms of the chair in an effort to stop it from falling, but the arms were wet and slippery and she could not stop it. She "held [Fleenor] as much as [she] could, with [her] knees braced," preventing the chair from slamming down, but ultimately, Fleenor landed on the tile floor still in the chair. According to T.M., Fleenor realized that he was falling and lifted his head in anticipation of the fall, preventing his head from hitting the ground.

{¶ 3} T.M. called for help and nurse, K.N., entered the shower room to assist. She got down on the floor to assess Fleenor. She asked if he had hit his head and he said no. She took his blood pressure, which was a little high, "looked him over, checked his strength, looked at his eyes, [and] checked his head." She observed some redness on his shoulders from where his shoulders were lying against the shower chair, but observed no other injuries and her assessment was otherwise negative. K.N., T.M., and another aide lifted Fleenor off the floor.

2.

{¶ 4} Fleenor's physician was notified of the fall and a voice mail was left for Fleenor's son, alerting him to the fact that his father had fallen. The nursing staff performed regular neurological checks over the next 13 hours and completed 72-hour post-fall check sheets. Fleenor's vital signs were checked frequently during that time. His blood pressure normalized during the night, the redness on his shoulders resolved, and the neurological checks remained negative. Fleenor reported pain in his back and neck, and Norco was administered and noted to be effective.

{¶ 5} On August 2, 2016, Fleenor was referred to occupational therapy for "OT intervention for [wheelchair] positioning" because of staff concerns that he would "slide out of [his wheelchair]." He was seen by occupational therapist, M.W., on August 3, 2016, for "modifications to [wheelchair] headrest with new rest constructed and mounted for appropriate fit." At that time, M.W. noted in her chart that Fleenor had "poor alertness with nursing staff stating [that he] fell over [the] weekend."

{¶ 6} The next morning, August 4, 2016, at 5:10 a.m., Fleenor was observed to be diaphoretic. By 6:30 a.m., he was unresponsive to verbal and physical stimuli. He died at 6:45 a.m. No autopsy was performed; his death certificate lists his manner of death as natural, the immediate cause of his death as end-stage dementia, and other significant contributing conditions as peripheral vascular disease and coronary artery disease. Fleenor's body was cremated.

3.

## B.  The Complaint

{¶ 7} Fleenor's estate filed an action against the County of Ottawa d/b/a Ottawa County Riverview Nursing Home, alleging negligence, wrongful death, and violations of R.C. 3721.13, Ohio Nursing Home Patients' Bill of Rights ("residents' rights").  It claimed that when Fleenor was dropped, he suffered severe injuries, and he was not sent to the hospital for medical care despite a documented physical and mental decline culminating in his death six days later.

{¶ 8} In support of its negligence claim, the estate alleged that Riverview's staff knew or should have known that it was unsafe to shower Fleenor using only a single aide; fail to provide adequate assistance in the shower; fail to have a properly installed, tested, and inspected shower chair; allow Fleenor to suffer skin breakdowns and falls; fail to provide adequate and timely care; fail to adequately and timely notify his family and doctor as to his condition and injuries; and fail to provide adequate treatment and care after Fleenor's final fall.  It further alleged that Riverview chose to provide too little nursing staff to ensure timely and adequate care to its residents, including Fleenor; it knew or should have known that its policy of understaffing created a dangerous environment for residents like Fleenor; it had a duty to—but chose not to—act reasonably in budgeting and providing funding to hire, train, and supervise staff to care for and assist residents like Fleenor; it had a duty to follow state and federal laws and regulations, the violations of which resulted in harm to Fleenor; and as a direct and proximate result of its

4.

negligence, Fleenor sustained permanent injury and loss, including conscious pain and suffering, disability, and death.

{¶ 9} In support of its wrongful death claim, the estate alleged that as a result of the negligence previously described, Fleenor sustained physical injuries that caused his wrongful and untimely death; and Fleenor's heirs and next of kin have suffered loss and damage as set forth in the Ohio wrongful death statute, including mental anguish and grief, medical and funeral expenses, and loss of Fleenor's support, services, society, and companionship.

{¶ 10} And in support of its claim for residents' rights violations, the estate alleged that Riverview directly or through its employees violated Fleenor's rights as a resident of the facility under R.C. 3721.13; these violations constitute negligence per se and give rise to a statutory action; and as a direct and proximate result of Riverview's violations of R.C. 3721.13, Fleenor endured conscious pain and suffering, disability, and an untimely death.

## C. Summary Judgment

{¶ 11} Riverview moved for summary judgment on all of the estate's claims. It argued that (1) the estate cannot establish a breach of a duty to Fleenor or causation for purposes of its negligence, wrongful death, and residents' rights claims; (2) its wrongful death claim was not brought in the name of the personal representative of the estate as required by R.C. 2125.02(A)(1); (3) Riverview is immune from liability under R.C.

5.

2744.01 et seq.; and (4) the estate failed to bring the action against an entity capable of being sued.

{¶ 12} With respect to the "breach" element of the estate's negligence and wrongful death claims, Riverview argued that it had no duty to prevent all falls, there was no evidence that T.M. caused the shower chair to tip, T.M. did her best to try to prevent and ultimately slow the fall, assessments were performed immediately after the fall, and it is mere conjecture whether the presence of a second aide would have prevented the fall.

{¶ 13} With respect to the causation elements of the estate's claims, Riverview argued, again, that there was no evidence that its employees caused the chair to tip and T.M. did her best to try to prevent injury to Fleenor. It also argued that there was no evidence that Fleenor hit his head or suffered a head injury; there was no evidence that Fleenor suffered a brain bleed or a subdural hematoma; there was no evidence that an undiagnosed brain bleed or subdural hematoma caused Fleenor's death; and even if Fleenor had an undiagnosed brain bleed or subdural hematoma, there was no evidence that it was caused by his fall in the shower.

{¶ 14} Respecting its claim of immunity, Riverview acknowledged that although it is a political subdivision under R.C. 2744.01(F) and its operation of the nursing facility constitutes a proprietary function under 2744.01(G)(1) generally rendering it immune from liability, an exception to immunity applies under R.C. 2744.02(B)(2) such that it may be liable "for injury, death, or loss to person or property caused by the negligent performance of acts by [its] employees with respect to proprietary functions of the

6.

political subdivision[].." It argued, however, that it is nevertheless immune from liability under R.C. 2744.03(A)(5) because Fleenor's injury "resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources" and there was no evidence that "the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 15} And respecting the estate's failure to bring the action against an entity capable of being sued, Riverview maintained that it could only be held accountable via a lawsuit against the county's board of commissioners.

{¶ 16} The estate responded that it had offered the opinions of expert witnesses, creating genuine issues of material fact as to whether the care rendered to Fleenor violated the standard of care and whether the injuries he sustained as a result of those violations caused his death. It argued that the trial court was obligated to construe this evidence in its favor.

{¶ 17} With respect to Riverview's claim of immunity, the estate maintained that (1) claims based on violations of the residents' rights statute are themselves an exception to political subdivision immunity; (2) the discretion exercised here was unrelated to "whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources;" and (3) it properly alleged that Riverview acted recklessly, thereby negating the defense asserted by Riverview under R.C. 2744.03(A)(5).

7.

{¶ 18} And as to Riverview's claim that the wrongful death claim was required to be brought in the name of the personal representative and the county was not an entity capable of being sued here, the estate argued that Riverview had not been prejudiced by these alleged errors and they are easily capable of being remedied under Civ.R. 15(A) by amending the complaint. It emphasized that the county had hired counsel to respond to the complaint, designated witnesses, participated in discovery, produced medical records, and made claims of attorney-client privilege, therefore, Riverview was not prejudiced and the estate should be permitted to amend the complaint to name the board of commissioners. The estate also pointed out that Riverview had filed suit in other cases seeking to collect facility fees and had done so as "Ottawa County d/b/a Ottawa County Riverview Nursing Home."

{¶ 19} Riverview replied that the estate's expert witnesses had relied on inadmissible evidence in forming their opinions. It insisted that the admissible evidence demonstrates that no genuine issue of material fact exists. Riverview also denied that the estate had properly pled reckless conduct by Riverview employees. And it disputed the estate's claim that it should be permitted to amend the complaint to sue in the name of the personal representative and to properly name the board of commissioners.

### D. Trial Court Judgment

{¶ 20} The trial court granted Riverview's motion. It determined that the operation of Riverview, a county home, is a proprietary function, entitling it to political subdivision immunity under R.C. 2744.02(A)(1). It recognized that under R.C.

8.

2744.02(B)(2), a political subdivision may be liable for injury or death caused by the negligent performance of acts by its employees if none of the exceptions in R.C. 2744.03 apply. But it found that such an exception *does* apply here—R.C. 2744.03(A)(5).

{¶ 21} The court concluded that here, Riverview exercised discretion in creating and implementing Mr. Fleenor's care plan. It further concluded that no evidence had been presented that Riverview exercised its discretion with malicious purpose, in bad faith, or in a wanton or reckless manner. It, therefore, found that Riverview was protected from liability by political subdivision immunity and was entitled to judgment as a matter of law.

{¶ 22} The estate appealed. It assigns the following errors for our review.

### ASSIGNMENT OF ERROR NUMBER 1

The Trial Court erred in granting summary judgment.

### ASSIGNMENT OF ERROR NUMBER 2

The Trial Court erred in disregarding evidence of recklessness in the Defendant-Appellee's staff disregarding Mr. Fleenor's decline after his fall until his death.

### ASSIGNMENT OF ERROR NUMBER 3

The Trial Court erred in adopting the moving-party (Defendant-Appellee's) facts and disregarding facts favoring Plaintiff-Appellant, construing facts in favor of the moving-party (Defendant-Appellee), and drawing inference in favor of the moving-party (Defendant-Appellee).

9.

## II. Standard of Review

{¶ 23} Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996), employing the same standard as trial courts. *Lorain Natl. Bank v. Saratoga Apts.,* 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989). The motion may be granted only when it is demonstrated:

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 24} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984). A

10.

"material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826, 675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 201 (1986).

### III. Law and Analysis

{¶ 25} In its first assignment of error, the estate argues that the trial court erred in granting summary judgment to Riverview. In its second assignment of error, it argues that the trial court erred in disregarding evidence of the recklessness of Riverview's staff in failing to take appropriate action in response to Fleenor's decline following his fall. And in its third assignment of error, the estate argues that the trial court erred in adopting Riverview's version of the facts and in construing the facts and drawing inferences in Riverview's favor. The estate's assignments of error are interrelated and will be discussed together.

### A. The Immunity Analysis

{¶ 26} The trial court dismissed all of the estate's claims on one basis: political subdivision immunity. The court held—and the parties agree—that Riverview is a political subdivision engaged in a proprietary function but that R.C. 2744.02(B)(2) applies, potentially stripping it of its immunity. The estate adds that under R.C. 2744.02(B)(5), its claim for residents' rights violations provides another basis to strip

11.

Riverview of its immunity.  The parties dispute whether R.C. 2744.03(A)(5) operates to reinstate immunity here, and it is that issue that is critical, initially, in resolving the estate's appeal.

{¶ 27} As the Ohio Supreme Court explained in *Cramer v. Auglaize Acres,* 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9, ¶ 14, "[d]etermining whether a political subdivision is immune from tort liability pursuant to R.C. Chapter 2744 involves a three-tiered analysis."  (Internal citations and quotations omitted.)  Under the first tier, if the political subdivision is performing a governmental or proprietary function, it will generally be immune from liability.  *Id*.  Under the second tier, the court must determine whether any exceptions to immunity listed in R.C. 2744.02(B) apply, exposing the political subdivision to liability.  *Id.* at ¶ 15.  If any of those exceptions apply, under the third tier, the court must determine whether any of the defenses in R.C. 2744.03 apply, thereby reinstating political subdivision immunity.  *Id.* at ¶ 16.

{¶ 28} The court found that R.C. 2744.03(A)(5), in fact, provided a defense, thereby reinstating Riverview's immunity.

**1.  R.C. 2744.03(A)(5)**

{¶ 29} Under R.C. 2744.03(A)(5), "[i]n a civil action brought against a political subdivision * * * to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability * * *":

12.

The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

{¶ 30} The court found that the negligence alleged here arose from the exercise of discretion of Riverview's employees in creating and implementing Fleenor's care plan. It also found that there was no evidence that that discretion was exercised with a malicious purpose, in bad faith, or in a wanton or reckless manner. The estate challenges both of these conclusions.

{¶ 31} As to the issue of discretion, the estate denies that the injury here arose from "the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources." It maintains that the nurse aide did not *decide* to tip Fleenor out of his chair, and the staff who identified significant changes in Fleenor's condition in the following days—but who failed to chart their observations, tell Fleenor's family doctor, or take him to the hospital—were not exercising discretion in determining how to use equipment or facilities. The estate insists that if R.C. 2744.03(A)(5) is interpreted to encompass "negligent care far outside the care plan," this would result in de facto immunity for all nursing home negligence committed in county-owned nursing homes.

13.

{¶ 32} The Ohio Supreme Court addressed the issue of immunity of county-owned nursing homes in examining a claim for violations of residents' rights under R.C. 3721.13. In *Cramer*, 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9, plaintiff's decedent was a 71-year-old resident of Auglaize Acres, a county home created by the Auglaize County Board of County Commissioners. Two nurses employed by the home were helping him into bed using a Hoyer lift, when they apparently dropped him. Approximately five hours later, another nurse observed that the resident was in pain, his left leg and foot were swollen, and his leg was deformed above the knee. The resident was taken to the hospital, where he was diagnosed with a fractured left femur. He underwent surgery to repair the break, but died two days later.

{¶ 33} The resident's estate filed a complaint against the home, the board of commissioners, and nurses employed by the home, alleging negligence, falsification of medical records, intentional infliction of emotional distress, residents' rights violations, respondeat superior liability, and agency by estoppel. The defendants asserted the defense of governmental immunity and moved for summary judgment on this basis.

{¶ 34} The home and the commissioners argued that they were immune from liability under the defenses available in R.C. 2744.03(A)(3) and (5), and the individual nurses argued that they were immune from liability under R.C. 2744.03(A)(6). The trial court granted summary judgment to the nurses on plaintiff's negligence claim. It granted summary judgment to the home and the commissioners on plaintiff's claim of intentional infliction of emotional distress and on the claims of negligence and violation of patient

14.

rights, but only insofar as punitive damages were sought. It denied the summary judgment motion in all other respects, finding that (1) the allegation of wanton and reckless conduct precluded the employees' defense of immunity on the claim for intentional infliction of emotional distress, (2) R.C. 3721.17(I)(1) created a cause of action against the nurses for allegedly violating the resident's rights, and (3) the home and the commissioners were not immune for their employees' negligence.

{¶ 35} Plaintiff appealed to the Third District Court of Appeals, challenging the trial court's application of governmental immunity and the constitutionality of R.C. Chapter 2744. The court of appeals affirmed the granting of summary judgment to the home and commissioners on the claim for intentional infliction of emotional distress; it agreed that plaintiff could not collect punitive damages against the home or the commissioners; and it affirmed the holding that the nurses were not protected against intentional tort allegations. But the court of appeals held that the trial court erred in failing to grant summary judgment to the home and commissioners on plaintiff's claims for the nurses' intentional actions, in failing to consider a defense under R.C. 2744.0[3](A)(5) that the nurses' decisions in providing medical care were discretionary, and in holding that R.C. 3721.17(I)(1) imposed liability on the nurses for residents' rights violations.

{¶ 36} The Ohio Supreme Court accepted plaintiff's request for a discretionary appeal and agreed to determine whether governmental immunity applies to unlicensed county nursing homes and its employees when they are sued for residents' rights

15.

violations. Ultimately, the court held that R.C. 3721.17(I)(1) specifically grants a cause of action to residents of county nursing homes, including unlicensed homes, against a political subdivision for residents' rights violations under the exception to immunity found in R.C. 2744.02(B)(5). It concluded, however, that R.C. 3721.17(I)(1) does not expressly impose liability on the employees of a county nursing home under R.C. 2744.03(A)(6)(a).

{¶ 37} After reaching these conclusions and acknowledging that both R.C. 2744.02(B)(2) and (5) may operate as exceptions to the home and commissioners' immunity, the Ohio Supreme Court explained that the next step in the analysis is to consider whether any defense under R.C. 2744.03 reinstates that immunity.

{¶ 38} The plaintiff argued that as a matter of law, the defense in R.C. 2744.03(A)(5) is not available because although the nurses had discretion to decide whether to use the Hoyer lift to put the resident in bed, once they decided to use the lift, there was no discretion left because there is only one method for using it. The plaintiff also contended that after the resident fell, the nurses failed to follow the home's policy regarding falls.

{¶ 39} The Ohio Supreme Court disagreed that the decision to use the Hoyer lift was the only discretionary act involved—it noted that the nurses' treatment decisions were also discretionary. But it recognized that "the proper method for using the Hoyer lift and the issue of whether the nurses properly followed the home's policy concerning patient falls" were disputed. *Id.* at ¶ 35. It determined that "[b]ecause there are material

issues of fact as to whether the nurses acted maliciously, in bad faith, wantonly, or recklessly," it cannot be concluded as a matter of law that R.C. 2744.03(A)(5) is inapplicable * * *." *Id.* The court held that resolution of these questions was for the factfinder to decide.

{¶ 40} Here, the estate's claims revolve around whether Fleenor's care plan required two people to roll his shower chair into the shower, whether the appropriate shower chair was used, whether appropriate care was rendered to Fleenor after the shower chair tipped backwards, whether staff took appropriate measures to have Fleenor evaluated, whether nursing notes reflected an accurate assessment of Fleenor's condition in the days after his fall, and whether appropriate information was communicated to Fleenor's physician and family. Based on the Ohio Supreme Court's interpretation of R.C. 2744.03(A)(5), in regards to the estate's allegations of merely negligent conduct, we are constrained to find that the actions of the nursing staff constitute exercises of judgment or discretion. Accordingly, Riverview can be held liable only to the extent that such judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

### 2. Malicious Purpose, Bad Faith, or Wantonness and Recklessness

{¶ 41} The estate maintains that it presented evidence that the county's employees exercised their judgment or discretion in a manner that was reckless or wanton, thus rendering Riverview's defense under R.C. 2744.03(A)(5) unavailable. It claims that it was reckless for T.M. to roll Fleenor into the shower backwards, knowing that he was top

17.

heavy due to the amputation of his legs. It also claims that two days before his death, as his brain injury worsened, Fleenor became less responsive and stopped all complaints of pain—a significant change in condition—yet the nursing staff failed to alert anyone or seek medical treatment. Instead, it contends, despite understanding the danger of falls and delayed head injuries, Riverview staff chose not to report this information to anyone who could help, tried to hide it by failing to document Fleenor's worsening condition, then failed to report his death to the coroner.

{¶ 42} The Ohio Supreme Court has considered the meaning of "reckless" and "wanton." "Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. City of Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 33, *reconsideration denied*, 133 Ohio St.3d 1511, 2012-Ohio-6209, 979 N.E.2d 1289. "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* Issues regarding wanton or reckless behavior are generally questions presented to the jury unless the record lacks evidence demonstrating that the political subdivision employee acted in such a manner. *Schoenfield v. Navarre*, 164 Ohio App.3d 571, 2005-Ohio-6407, 843 N.E.2d 234, ¶ 24 (6th Dist.); *Price v. Telb*, 6th Dist. Lucas No. L-08-1099, 2009-Ohio-3496, ¶ 9.

18.

{¶ 43} To support its claim that Riverview's staff acted recklessly and wantonly, the estate relies heavily on an August 2, 2016 referral to occupational therapy, an August 3, 2016 note of occupational therapist, M.W., and M.W.'s testimony describing her observations and assessment of Fleenor. The estate maintains that the August 2, 2016 referral and August 3, 2016 note demonstrate that Fleenor experienced a change in cognition caused by the fall in the shower chair. Riverview responds that M.W. lacked personal knowledge of the fall, she offered only inadmissible hearsay, her opinions were speculative, she was not designated as an expert medical witness, and she was asked to provide opinions to false hypotheticals that misrepresented the facts. It also maintains that the OT referral was made before the fall.

{¶ 44} The occupational therapy records reveal that Fleenor—who used a tilt-in-space wheelchair equipped with a seatbelt—saw M.W. on August 2, 2016. At her deposition, M.W. explained that she received a request for an occupational therapy evaluation on August 2, 2016, for wheelchair positioning because the nursing staff was concerned that Fleenor was sliding out of his wheelchair. M.W. confirmed that this was a change from Fleenor's prior condition. She was not told at that time that Fleenor had fallen backwards in his shower chair. M.W. charted that staff was reporting "increased trunk thrusting posteriorly with forward slide in [wheelchair]." She further indicated that Fleenor had "poor stability with [wheelchair] posture and ability to remain upright sit[.]"

{¶ 45} Fleenor was seen for therapy by M.W. the following day. M.W. observed that his alertness was poor and he was having trouble keeping his head up. Again, she

19.

confirmed that in her experience with Fleenor, this was a new issue for him. M.W. commented about Fleenor's poor alertness to the member of the nursing staff who brought him to her (whose identity she could not recall). That employee told M.W. that the reason Fleenor was not alert was because he had fallen. M.W. charted: "modification to [wheelchair] headrest with new rest constructed and mounted for appropriate fit. [Patient] with poor alertness with nursing staff stating [patient] fell over weekend."

{¶ 46} Riverview denies that "anyone ever said Fleenor's poor alertness was 'because of' the shower room incident." But M.W.'s testimony makes clear that this is indeed what her note meant:

> Q: * * * You mount a headrest to help * * * him keep his head up, right?
>
> A: Correct.
>
> Q: Because he's having trouble keeping his head up at this point?
>
> A: I indicate that, yes.
>
> Q: And then you identify that he is not at his normal level of alertness?
>
> A: I identified his alertness as poor.
>
> Q: And you're noting that because that's not what you would expect from him?
>
> A: Correct.

20.

Q: So that's a change in his condition that you thought was important to note?

A: Yes.

Q: And you either ask or the nursing staff volunteers an explanation for that; correct?

A: Correct.

Q: Do you remember who you were talking with about that?

A: I do not.

Q: Would you expect that if nursing staff is communicating with you about these types of things they would be documenting in their own notes?

A: Yes.

Q: *And what do they communicate to you as to the explanation as to why Jennings Fleenor is not alert?*

A: *He fell.*

(Emphasis added.)

{¶ 47} So even if M.W.'s note did not specifically say that Fleenor had poor alertness *because* he fell, M.W. made clear at her deposition that this was exactly what she meant when she wrote the therapy note. Given this testimony, we cannot agree with Riverview that no one said Fleenor's poor alertness was because of his fall.

21.

{¶ 48} Riverview also characterizes the statements made to M.W. as inadmissible hearsay. Riverview merely cites to Evid.R. 801 and 802 without citing any case law or explaining the basis for its argument, but it apparently takes issue with M.W. relaying the statement of the unnamed member of the nursing staff that Fleenor exhibited poor alertness due to his fall. We disagree with Riverview that the statement from this employee constituted inadmissible hearsay. Rather, we find that (1) the statement falls within the exception in Evid.R. 803(4) as a statement made for the purpose of medical diagnosis or treatment, and (2) the statement is non-hearsay under Evid.R. 801(D)(2) because it was an admission of a party-opponent.

{¶ 49} Under Evid.R. 803(4) "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are not excluded by the hearsay rule. In *State v. Nasser*, 10th Dist. Franklin No. 02AP-1112, 2003-Ohio-5947, ¶ 54, the Tenth District made clear that "Evid.R. 803(4) does not require that a statement made for medical purposes be made by the patient. * * * [S]tatements by others, most often close family members, may be received if the relationship or the circumstances give appropriate assurances." *Id.,* citing *McKenna v. St. Joseph Hosp.,* 557 A.2d 854, 858 (R.I.1989) (finding that unidentified "bystanders' statements c[a]me within the exception embodied in Rule 803(4) [because they were] * * * statements * * * made by an

individual to emergency personnel with no motive to fabricate or lie, describing with particularity a specific situation").

{¶ 50} Here, M.W. was attempting to render occupational therapy to Fleenor and the nursing staff—speaking for a resident who was unable to speak for himself—provided information to M.W. concerning the general character of the cause or external source of Fleenor's symptoms. This employee had no motive to fabricate or lie. The statement falls under Evid.R. 803(4).

{¶ 51} In any event, the statement of the unidentified Riverview employee was not hearsay under Evid.R. 801(D)(2) because it was an admission by a party-opponent. *See, e.g., Davis v. Sun Refining & Marketing Co.,* 109 Ohio App.3d 42, 53, 671 N.E.2d 1049 (2d Dist.1996) (concluding that statement of unidentified employee concerning matter in the scope of his employment was not hearsay under Evid.R. 801(D)(2)). We, therefore, disagree that M.W.'s note and testimony—connecting Fleenor's poor alertness to his fall—are barred as inadmissible hearsay.

{¶ 52} Riverview also claims that M.W. was provided with false hypotheticals and her opinions were speculative. T.M. testified that when Fleenor's chair tipped backwards, Fleenor was able to anticipate the fall and brace himself so that his head did not strike the tile floor. Counsel for the estate sought to determine if this was plausible. He asked M.W.—based on her familiarity with Fleenor through her treatment of him as an occupational therapist—if Fleenor was sitting in a shower chair, "and the whole chair

23.

tipped backwards," whether it would be fair to say that he lacked the core strength and ability to prevent himself from falling backwards and to control his body to avoid hitting the ground. Based on her personal observations of Fleenor, M.W. opined that he lacked this strength and control. We would not characterize the hypotheticals posed to M.W. as "false," nor would we discount her opinions as speculative.

{¶ 53} As for M.W.'s lack of personal knowledge, the estate never claimed that M.W. possessed personal knowledge of the fall. Its examination of M.W. focused on her observations of Fleenor's cognition on August 2-3, 2016, and tested the plausibility of T.M.'s description of the fall, specifically that Fleenor braced himself to protect against hitting his head as the shower chair tipped backwards.

{¶ 54} In *Cramer*, 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9, the Ohio Supreme Court concluded that whether the employees who dropped the resident properly used the Hoyer lift and followed the home's policy concerning patient falls presented disputed issues of material fact "as to whether the nurses acted maliciously, in bad faith, wantonly, or recklessly" under R.C. 2744.03(A)(5). *Id.* at ¶ 35. Here, in addition to issues raised concerning the appropriateness of one aide rolling Fleenor into the shower backwards, the estate also raised concerns about the staff's response to the fall, the absence of charting, and the extent to which the staff may have observed—but ignored— a significant change in condition indicative of a head injury. As in *Cramer,* we cannot

say as a matter of law that Riverview's nursing staff exercised its discretion in a manner that was not reckless or wanton.[1] This must be determined by the trier of fact.

## B. Causation

{¶ 55} Riverview insists that even if its immunity defense fails, it is nonetheless entitled to summary judgment because the estate is unable to establish causation. Specifically, it argues that the estate cannot identify the cause of Fleenor's fall or demonstrate that the fall caused his death. In connection with its position, Riverview contends that the estate's medical experts' opinions must be rejected because they are not supported by the evidence in the factual record, they disregard T.M. and K.N.'s testimony, and they are speculative.

### 1. Cause of the Fall

{¶ 56} Riverview insists that "when a plaintiff is unable to identify or explain the cause of a fall, the element of causation" fails. The estate responds that Riverview staff conceded at their depositions that a resident's shower chair should not tip backwards while being rolled into the shower. It maintains that the cause of the fall was T.M.'s failure to control the shower chair in such a manner that it would not tip; the specific

---

[1] Riverview also argues that the estate failed to allege recklessness. The estate did, in fact, allege recklessness at ¶ 19 of its complaint and identified evidentiary materials in its motion for summary judgment that it argued demonstrated recklessness. *See Brannon v. Austinburg Rehab. & Nursing Ctr.*, 190 Ohio App.3d 662, 2010-Ohio-5396, 943 N.E.2d 1062 (11th Dist.), fn. 1 (finding that plaintiff preserved the question of an exception to governmental immunity when it alleged in its complaint that the defendant's actions were performed in a "grossly negligen[t] manner and recklessly," however, it failed to supply evidentiary materials demonstrating recklessness).

25.

reason for it tipping—a locked wheel, movement by Fleenor, pushing the chair too fast—does not matter. We agree with the estate. Under the circumstances of this case, given that T.M. was in control of the shower chair when it tipped backwards and fell, it cannot be credibly disputed that her action or inaction caused the fall. It is of no matter that the precise mechanism of the fall is unexplained.

{¶ 57} In reaching this conclusion, we find the cases cited by Riverview in support of its position—*Miller v. Toledo Hosp.,* 6th Dist. Lucas No. L-16-1211, 2017-Ohio-2691, and *McFarren v. Canton*, 2016-Ohio-484, 59 N.E.3d 652, ¶ 82 (5th Dist.)—distinguishable.

{¶ 58} In *Miller*, a 77-year-old patient admitted to the hospital's cardiac step-down unit fell, fracturing his right hip. He had been noted to have memory issues and was assessed to be at "high risk" for falls, thereby requiring hospital staff to implement fall precautions, including assigning him a room near the nurse's station, leaving the door open, instructing him to call for assistance, providing assistance with transfers and ambulation, and considering the use of a bed alarm. One night, the patient fell. There was one nurse who witnessed the fall, but she died before providing a statement regarding the incident. She had charted: "[Patient] found walking into bathroom per self. Was asked if he needed any help. [Patient] proceeded towards toilet, lost balance and fell. Was asked if anything hurt, said only [right] inner upper leg. Abrasion noted on [right] fa. No other apparent injuries noted." *Id.* at ¶ 3.

**{¶ 59}** The hospital moved for summary judgment, the trial court granted the motion, and we affirmed. We found that causation could not be established because there were too many unanswered questions as to the cause of the fall, including:

> Was [the nurse] close to [the patient] (or even present in his room) when she spotted him out of bed, or was she farther away, perhaps in the hallway, when she saw him? How quickly did [he] fall after [she] first spotted him: was it instantaneous, or did [he] only fall after an appreciable moment or more? Was [she] standing still or moving toward [him] when she asked if he needed assistance? Was there some "logistical" impediment delaying [the nurse's] ability to get to [the patient] ([Her] chart note stated that he was walking *into* the bathroom and that he proceeded *to* the toilet, as opposed to a more general observation that he was walking *to or towards* the bathroom)? Did [the nurse], in fact, have a failed attempt to assist [him], causing him to "land on bottom?" Did [she] simply stand (in some unknown location) and watch these events unfold? Did she dart in [his] direction but fail to reach him in time? What else might have happened that [she] did not record in her note? There are no established facts to support reasonable answers to any of these, or similar questions.

*Id. at* ¶ 26.

**{¶ 60}** In *McFarren,* a resident of a residential care facility was found on the floor of her room with a fractured hip. She died the next week. The appellate

court affirmed summary judgment in favor of the facility on plaintiff's negligence claim because there was no evidence in the record to establish a genuine issue of material fact as to how the resident fell and it was, therefore, speculative whether instituting different fall precautions would have prevented her fall.

{¶ 61} Unlike *Miller* and *McFarren,* we know what caused Fleenor's fall: the nurse aide failed to prevent his shower chair from tipping backwards as she rolled him into the shower. The precise reason the chair tipped backwards—a locked wheel, a raised tile, movement by Fleenor, rolling the chair too fast—is of no matter under these circumstances.

### 2. Expert's Opinions

{¶ 62} The estate identified as medical experts Theodore Homa, M.D., Richard Stefanacci, D.O., and Erica Armstrong, M.D. All of these medical experts testified that in their opinion, Fleenor sustained a subdural hematoma when he fell backwards in the shower chair. They opined that his death was caused by this subdural hematoma—not dementia.

{¶ 63} Dr. Armstrong, a forensic pathologist, concluded, based on her review of the evidence and her specialized knowledge, skill, experience, training, and education, that in the six days following Fleenor's fall, his "health did not return to baseline but instead deteriorated with signs of increased muscle weakness, decreased alertness, and increased confusion." She opined that these signs and symptoms "are indicative of a progressively evolving pathophysiological process that temporally occurred after the fall"

28.

and "to a reasonable degree of medical probability, that sequela of head, neck, and/or torso injury from that fall caused Mr. Fleenor's death." In Dr. Armstrong's view, Fleenor's death should have been reported to the Ottawa County coroner, and the failure to do so "precluded the opportunity for a postmortem examination and determination of cause and manner of death."

{¶ 64} Drs. Homa and Stefanacci testified that they based their opinions on their review of the medical records, the testimony of the nurses, aides, and therapists who cared for Fleenor, and their education, training, and experience in working with geriatric patients with the same or similar conditions as Fleenor. They testified that it was incumbent on Riverview to seek an order for imaging of Fleenor's head or take him to the hospital to obtain imaging after his fall. They also testified that as a result of his head injury, Fleenor's cognition deteriorated in the days that followed, also requiring action by the nursing staff. They opined to a reasonable degree of medical certainty that Fleenor most likely suffered a subdural hematoma and that was the ultimate cause of his death, despite the fact that Fleenor's death certificate reported otherwise.

{¶ 65} One of Riverview's challenges to the experts' testimony was that they rejected T.M. and K.N.'s testimony. In particular, because the medical records and the testimony of Fleenor's medical providers reflect that Fleenor was weak and often not in control of his movement, Drs. Homa and Stefanacci were skeptical of T.M.'s testimony that Fleenor was able to brace himself so that his head would not hit the ground. And even though both T.M. and K.N. testified that Fleenor said he did not hit his head, Drs.

29.

Homa and Stefanacci were skeptical that Fleenor reliably answered T.M. and K.N.'s questions. This was because several members of the nursing staff testified at deposition that because of his dementia, Fleenor often provided inaccurate information and even denied being in pain when he was clearly exhibiting non-verbal manifestations of pain that the staff had come to recognize.

{¶ 66} Under Evid.R. 705, an "expert may testify in terms of opinion or inference and give the expert's reasons therefor after disclosure of the underlying facts or data." This court has recognized that in eliciting an expert's opinions, it is not necessary to include "all of the conflicting statements made by various witnesses." *Community Traction Co. v. Wandtke*, 32 Ohio App. 207, 214, 167 N.E. 701, 704 (6th Dist.1929). To the contrary, a party is entitled to provide its experts with its version of the disputed facts in obtaining their opinions. *Lawson v. Song*, 4th Dist. Scioto No. 97 CA 2480, 1997 WL 596293 (Sept. 23, 1997). *See also Community Traction* at 214 ("[I]t is sufficient if the question assumes the existence of facts which the evidence fairly and reasonably tends to establish in support of the claim or theory for which the party asking the question is contending.").

{¶ 67} Here, the estate's experts fully disclosed both that they had discounted T.M. and K.N.'s testimony in reaching their conclusions and why they discounted it. And even though T.M. was the only observer of Fleenor's fall, the accuracy of T.M.'s version of events is itself a fact question, particularly in light of M.W.'s testimony that Fleenor lacked the control and strength to protect his head in anticipation of the chair

30.

tipping backwards. *See Killilea v. Sears, Roebuck & Co.,* 27 Ohio App.3d 163, 167, 499 N.E.2d 1291 (10th Dist.1985) ("If an issue is raised on summary judgment, which manifestly turns on the credibility of the witness because his testimony must be believed in order to resolve the issue, and the surrounding circumstances place the credibility of the witness in question—for example, where the potential for bias and interest is evident—then, the matter should be resolved at trial, where the trier of facts has an opportunity to observe the demeanor of the witness.").

{¶ 68} Riverview also challenged the estate's experts' opinions on the basis that their CVs were outdated and counsel for the estate assisted in drafting their expert reports. We reject both of these challenges. To the extent that the experts' CVs were outdated, Drs. Homa and Stefanacci testified at deposition and provided updated information about their professional experience. And concerning counsel's participation in drafting the experts' reports, Dr. Homa testified that the estate's lawyer drafted his report, but he explained that he "had a conversation that included my entire review and summary, my conclusions, the way I saw things come together, and from there notes were taken and then this was typed up, and then sent back to me for approval." He confirmed that he found nothing in the report that was incorrect and there were no substantive errors. Civ.R.26(B)(7) does not prohibit counsel from assisting in drafting an expert's report, particularly where, as here, the reports were generated based on the information provided by the experts about the substance and reasons for their opinions,

31.

the experts adopted the contents of the reports by signing them, and the experts testified at deposition to opinions and conclusions that were consistent with what was expressed in their reports.

{¶ 69} Given the experts' opinions concerning the sequela of events that often occurs when a person sustains a head injury, and construing all evidence in the estate's favor as required under Civ.R. 56, we cannot conclude that the sequence of events here—Fleenor's fall, his poor alertness just a few days later, culminating in his death six days after the fall—was a mere "coincidence of timing," as Riverview would have us do. Rather, we find that the evidence presents a question of fact concerning causation that cannot be resolved on summary judgment.

### C. Sui Juris

{¶ 70} Riverview contends that the claims against it were properly dismissed because Ottawa County is not sui juris. It argues that "[u]nless a county has adopted a charter or alternative form of government—which Ottawa County has not—it may be held accountable only when sued through its Board of County Commissioners." We disagree.

{¶ 71} R.C. 2744.02(B)(2) and (5) set forth circumstances under which a "political subdivision" may be liable for injury, death, or loss to person or property. R.C. 2744.01(F) defines "political subdivision" to include a county. In *Plate v. Johnson*, 149 F.Supp.3d 827 (N.D.Ohio 2016), Judge Carr considered the question of whether the

plaintiff properly brought suit against Lucas County—which was itself named a defendant and was not sued through its board of county commissioners.

{¶ 72} Judge Carr acknowledged that "[a]s a political subdivision entitled, under Ohio law, to sovereign immunity, a county 'cannot sue or be sued except as specially authorized by statute.'" *Id*. at 829, quoting *Smith v. Grady*, 960 F.Supp.2d 735, 740 (S.D.Ohio 2013). He recognized that R.C. 301.22 (which provides that "[e]very county adopting a charter or an alternative form of government is a body politic and corporate for the purpose of enjoying and exercising the rights and privileges conveyed under it by the constitution and the laws of this state" and "is capable of suing and being sued") is one such Ohio statute that authorizes suit against a county. He explained, however, that R.C. 301.22 "does not define [a] County's capacity (or lack thereof) to sue, or its status as a juridical entity." *Id.* Rather, he concluded, "the question of a county's suability is not conceptually distinct from the county's sovereign immunity as a political subdivision of the state."

{¶ 73} Here, R.C. 2744.02(B)(2) and (5) provide exceptions to political subdivision immunity and render a county potentially liable for torts or statutory violations resulting in injury or death. In other words, a county is suable for claims falling within these exceptions to political subdivision immunity. We, therefore, conclude that Ottawa County was properly named a defendant to this action. *See also Clark v. Campbell*, 4th Dist. Ross No. 19CA3673, 2020-Ohio-3333, ¶ 43 (finding that

33.

county board of developmental disabilities was a political subdivision under R.C. 2744.01(F) that was capable of being sued); *Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 8th Dist. Cuyahoga No. 86620, 2006-Ohio-6759, ¶ 18, *aff'd in part, rev'd in part, on other grounds*, 118 Ohio St.3d 392, 2008-Ohio-2567, 889 N.E.2d 5 (rejecting Cuyahoga County Department of Children and Family Services' position that it was not sui juris because it was not a political subdivision).

{¶ 74} For these reasons, we agree with the estate that the trial court erred in granting summary judgment in favor of Riverview; we find its first assignment of error well-taken. We agree that the trial court erred in failing to find that a genuine issue of material fact exists concerning whether the nursing staff exercised its discretion in a manner that was reckless; we find its second assignment of error well-taken. And we agree that the trial court erred in disregarding evidence offered by the estate that raised genuine issues of material fact; we find its third assignment of error well-taken.

### IV. Conclusion

{¶ 75} We conclude that the trial court erred in granting summary judgment to Riverview because genuine issues of material fact exist concerning whether R.C. 2744.03(A)(5) provides a defense to immunity. Specifically, there are issues of fact concerning whether Riverview's nursing staff exercised its discretion in a reckless manner and whether such recklessness resulted in Fleenor's injury and death. We find the estate's three assignments of error well-taken.

34.

**{¶ 76}** Accordingly, we reverse the September 3, 2020 judgment of the Ottawa County Court of Common Pleas and remand this matter to the trial court for proceedings consistent with this decision.  Riverview is ordered to pay the costs of this appeal under App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.
_____
JUDGE

Thomas J. Osowik, J.

_____
Christine E. Mayle, J.                           JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.